IN THE MATTER OF BOARD OF EDUCATION OF THE TOWN
OF BOONTON, RESPONDENT, AND JUDITH M.
KRAMER, APPELLANT.

IN THE MATTER OF BOONTON EDUCATION ASSOCIATION
AND NEW JERSEY EDUCATION ASSOCIATION,
RESPONDENTS, AND JUDITH M. KRAMER, APPELLANT.

Argued January 21, 1985—Decided June 25, 1985.

526

*Nelson R. Kieff*, a member of the Virginia bar, argued the cause for appellant (*Mesirov, Gelman, Jaffe, Cramer & Jamieson*, attorneys; *Jeffrey A. Mintz*, on the briefs).

*Robert H. Chanin*, a member of the New York bar, argued the cause for respondents Boonton Education Association and New Jersey Education Association (*Ruhlman, Butrym & Friedman*, attorneys; *Robert H. Chanin* and *James J. Brudney*, a member of the District of Columbia bar, of counsel; *Richard A. Friedman* and *Barbara Rapkin*, on the brief).

*Andrew M. Wubbenhurst* argued the cause for respondent Board of Education of the Town of Boonton (*Curtin, Hubner & McKeon*, attorneys).

*Robert E. Anderson, Jr.*, General Counsel, argued the cause for Public Employment Relations Commission.

The opinion of the Court was delivered by

STEIN, J.

This appeal challenges the constitutionality of the 1979 amendments to the New Jersey Employer-Employee Relations Act, *N.J.S.A.* 34:13A–5.1 to –21, as amended, *L.*1979, *c.* 477.

The amendments authorize agreements between majority union representatives and public employers that require nonunion public employees to pay their majority representative a representation fee for services rendered. *N.J.S.A.* 34:13A–5.5 and –5.6. The constitutional challenges were initially asserted by appellant, Boonton public schoolteacher Judith Kramer, when she filed unfair labor practice charges with the New Jersey Public Employment Relations Commission (PERC) against her employer, the Boonton Board of Education (Board), her majority representative, the Boonton Education Association (BEA), and the New Jersey Education Association (NJEA). PERC granted in part and denied in part the relief sought by appellant, but declined to rule on the constitutional issues raised. This Court certified the matter directly while her appeal was pending in the Appellate Division. 99 *N.J.* 173 (1984).

I

In 1968 the Legislature passed the New Jersey Employer-Employee Relations Act (the Act). *L.*1968, *c.* 303. This Act granted to all public employees the right to join or refrain from joining employee organizations, and the right to conduct collective negotiations with public employers through majority representatives. *N.J.S.A.* 34:13A–5.3.

The avowed purpose of the Act was to foster the prevention and prompt settlement of labor disputes in the private and public sectors. *N.J.S.A.* 34:13A–2. To that end, the Act authorized majority representatives to negotiate agreements with public employers on behalf of the employees in the relevant bargaining unit. *N.J.S.A.* 34:13A–5.3. It further required that the majority representative "be responsible for representing the interest of all such employees without discrimination and without regard to employee organization membership." *Id.* Accordingly, the Act afforded the bargaining unit's nonunion public employees substantial benefits from the majority representative, without any cost obligation. See Sponsors' State-

ment, N.J. Assembly Bill No. 688, Feb. 9, 1978. The Act also established PERC. *N.J.S.A.* 34:13A–5.2. This administrative body was granted exclusive jurisdiction over unfair labor practices in the public sector and was authorized to make policy and establish rules and regulations governing employer-employee relations in public employment. *N.J.S.A.* 34:13A–5.2, –5.4.

Effective July 1, 1980, the Legislature amended. the Act to authorize agreements between public employers and majority representatives that would require employees who were not members of the majority representative to pay a representation fee not exceeding 85% of regular membership dues, fees, and assessments. *L.*1979, *c.* 477, § 2. The Sponsors' Statement clearly indicated that the purpose of the amendment was to eliminate the "free ride" enjoyed by nonunion members of the bargaining unit who received the benefit of services performed by the majority representative without sharing in the costs incurred. Sponsors' Statement, Assembly Bill No. 688, *supra.* The Statement cited *Abood v. Detroit Bd. of Educ.*, 431 *U.S.* 209, 97 *S.Ct.* 1782, 52 *L.Ed.*2d 261, reh'g denied, 433 *U.S.* 915, 97 *S.Ct.* 2989, 53 *L.Ed.*2d 1102 (1977), as authority for requiring nonunion members to help meet the costs of services rendered by the union.

Consistent with *Abood*, the statute required that the majority representative refund to nonunion employees any part of the representation fee used "either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment or applied toward the cost of any other benefits available only to members of the majority representative." *N.J.S.A.* 34:13A–5.5(c). This refund, however, was not to reflect "the costs of support of lobbying activities designed to foster policy goals in collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through collective negotiations with the public employer." *Id.*

The amended Act authorized public employers to withhold the representation fee by payroll deduction, but only if the union had established and maintained a "demand and return" system that provided a pro rata refund of those expenditures that the statute expressly determined should not be shared by nonunion member employees. *N.J.S.A.* 34:13A–5.6. The statute also required that the demand-and-return system provide for a procedure to review the amounts refunded, with the burden of proof on the majority representative. *Id.* The statute further provided that nonunion members have the right to appeal to a three-member board, consisting of a representative of public employers, a representative of public employee organizations, and a neutral member. *Id.*

## II

In June, 1981, pursuant to *N.J.S.A.* 34:13A–5.5, the Board and the BEA entered into an agreement that obligated Kramer, as a nonunion member of the negotiating unit, to pay a representation fee to the BEA commencing September, 1981. Although the BEA posted notices on September 22, 1981, informing members of the negotiating unit of the amount of the representation fee and a rebate procedure, Kramer claimed to have first learned about the representation fee in a letter from the BEA dated October 7, 1981. This letter invited her to become a member of the BEA and advised her that pursuant to *L.*1979, *c.* 477, all members of the negotiating unit who chose not to join the BEA would be required to pay a representation fee in lieu of dues. After receiving the letter, she asked a representative of the BEA for a written statement of the amount of the representation fee and for a copy of the contract authorizing the fee. According to Kramer, the statement was never furnished but a copy of the contract was given to her in December, 1981.

Shortly after receiving the letter from the BEA, Kramer notified the superintendent of schools that she refused to

authorize payroll deductions for the representation fee since she had not seen a copy of the contract or of the demand-and-return system mandated by statute. In fact, the BEA had adopted a demand-and-return system on September 30, 1981 and had posted a copy on the bulletin board in the faculty room on or about October 1, 1981.

Commencing February 1, 1982, the Board began deducting $74.16, an amount equal to twice the monthly representation fee, from Kramer's salary. This double deduction was made in order to recover the fees payable for the first five months of the school year—September through January—when no fees had been deducted.

In November, 1981, Kramer filed an unfair labor practice charge with PERC alleging that the Board had engaged in unfair practices by putting into effect an automatic payroll deduction for dues without signed authorization cards, thereby interfering with her right to refrain from union activity, in violation of *N.J.S.A.* 34:13A–5.3 and –5.4, and *N.J.S.A.* 52:14–15.9e. Kramer also alleged that the Board had imposed automatic payroll deductions for the representation fee without requiring the pre-establishment of a demand-and-return system, in violation of *N.J.S.A.* 34:13A–5.6. Simultaneously, Kramer filed unfair practice charges against the BEA and the NJEA, alleging that they had interfered with her rights under *N.J.S.A.* 34:13A–5.3 and –5.4 by refusing to allow her to see the agreement; by intimidating her from exercising her right to refrain from union activity; by demanding that she become a member of the union; by imposing a procedure for the automatic payroll deduction of representation fees without the establishment of a demand-and-return system in violation of *N.J.S.A.* 34:13A–5.6; by imposing a procedure for the automatic payroll deduction of dues without signed authorization cards, in violation of *N.J.S.A.* 52:14–15.9e; and by establishing an agency-fee system that charged certain union members lower amounts than certain nonmembers, reflecting a discriminatory dues system.

In February, 1982, Kramer filed an amended unfair practice charge against the BEA and NJEA, alleging that their attempt to collect the representation fee had violated her constitutional rights to freedom of speech and association. She also alleged that the representation fee was "unconstitutionally broad," since it could be used not only to pay for activities related to bargaining and contract administration, but also to subsidize lobbying activities in support of various partisan political and social issues.

In September, 1982, a hearing was held before a PERC hearing examiner, who issued his recommended report and decision in March, 1983. *In re Boonton Bd. of Educ.*, 9 *N.J. Public Employee Rptr.* (Labor Relations Press) ¶ 14114 (Gerber, Hearing Examiner, March 25, 1983). The BEA, NJEA, and Kramer filed exceptions to the hearing examiner's recommendations. PERC issued its decision and order in July, 1983. *Id.*, ¶ 14199 (Public Employment Relations Commission, Decision and Order, July 18, 1983).

PERC first determined the jurisdictional issues: it concluded that constitutional challenges to the representation-fee statute were within the exclusive province of the courts; that the three-member appeals board had sole jurisdiction over matters pertaining to the amount of any representation-fee rebate; and that PERC alone had jurisdiction over unfair labor practice claims that did not challenge the amount of the rebate or the constitutionality of the rebate system. *Id.*, ¶ 14199, at 478–79.

On the basis of this jurisdictional finding, PERC concluded that the hearing examiner had properly refused to entertain Kramer's constitutional challenges to the statute. Moreover, PERC held that the hearing examiner had properly quashed a subpoena *duces tecum* served by Kramer that sought the production of all documents pertaining to the operation of the demand-and-return system and the calculation of the representation fee. PERC found these matters to be within the exclusive jurisdiction of the appeals board. *Id.*

PERC further determined that the demand-and-return system adopted on September 30, 1981 satisfied the statutory mandate. It found, however, that the deduction of representation fees from Kramer for the month of September, 1981 constituted an unfair labor practice since the BEA had not established its demand-and-return system until September 30, 1981. *Id.* at 479; *see N.J.S.A.* 34:13A–5.6. PERC disagreed with the hearing examiner's finding that the BEA had not interfered with, restrained, or coerced Kramer in the exercise of her right not to join the BEA. PERC found that the BEA letter of October 7, 1981 was potentially misleading, that the BEA membership chairman had refused to give Kramer a written statement concerning her representation fee, and that an NJEA representative had advised Kramer that he did not have to discuss representation fees with a nonmember. *In re Boonton, supra,* 9 *N.J. Public Employee Rptr.* ¶ 14199, at 479–80. PERC found such statements to reflect an "unacceptably grudging attitude towards the rights of non-members to refrain from joining the Association and to secure information concerning the representation fee system." *Id.* at 480. PERC further found that the BEA had committed an unfair labor practice in failing to notify Kramer and other nonunion members personally of their rights under the demand-and-return system and of the procedures for obtaining a rebate. *Id.*

With respect to the challenge asserted to the fee structure, PERC rejected Kramer's contention that the distinction between fees paid by nonunion teachers and union support staff was discriminatory or otherwise unlawful. PERC also held that it was an unfair labor practice to require Kramer's representation fee to be withheld from her paycheck rather than to allow her to pay it in a lump sum. *Id.*

### III

On appeal, appellant renews her constitutional challenge to the validity of the statute and the demand-and-return system

established thereunder. She also challenges PERC's holding that the hearing examiner properly quashed the subpoena for financial information and properly refused to consider the purposes for which representation fees were being expended. Finally, in this appeal, appellant argues for the first time that the BEA practice of transmitting a portion of her representation fee to county, state, and national unions constitutes an unfair labor practice.

 We first address appellant's contention that PERC improperly upheld the quashing of her subpoena of BEA and NJEA financial records. Appellant argues that PERC's jurisdiction under the statute is sufficiently broad to accommodate the inquiry that the subpoena was designed to pursue. Although this Court is not bound by PERC's determination of its own jurisdiction, an administrative agency's interpretation of a statute it is charged with enforcing is entitled to substantial weight. *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 575 (1978); *In re Application of Saddle River*, 71 *N.J.* 14, 24 (1976).

██ In this instance, PERC's interpretation is consistent with our own conclusion as to the intent of the Legislature. As noted above, the subpoena sought to compel production of all BEA and NJEA records pertinent to the calculation of the representation fee, the refundable amount, and the cost of activities related to collective negotiations. In quashing the subpoena, the hearing examiner concluded, and PERC agreed, that the purpose of the subpoena was to discover what constituted an appropriate representation fee to be charged by the majority representative. *In re Boonton, supra*, 9 *N.J. Public Employee Rptr.* ¶ 14114, at 251 n. 5; *id.*, ¶ 14199, at 479. PERC determined that the appropriateness of representation fees was a matter expressly delegated by the Legislature to the appeal board established pursuant to the statute. *Id.*, ¶ 14199, at 478; *see N.J.S.A.* 34:13A–5.6. PERC supported its jurisdictional analysis by citing legislative history that revealed that an

early draft of the legislation had empowered PERC to resolve all challenges to the amount of the representation fee. *In re Boonton, supra,* 9 *N.J. Public Employee Rptr.* ¶ 14199, at 478; see Assembly Labor Committee Statement, Assembly Bill No. 688, June 19, 1978. This concept was modified by Assembly Labor Committee amendments, which substituted a three-member board for PERC as the body that would hear and determine challenges to the amount of the fee. The Committee Statement to the bill underscores the legislative intent to deny PERC jurisdiction over disputes concerning representation fees:

> The Public Employment Relations Commission had indicated to the committee that the role originally intended for it as an arbiter of fee challenges would have placed a heavy administrative burden on it and slowed its processing of unfair labor practice charges as well as scope of negotiation and unit determinations. At the urging of a coalition of public employee associations and unions, the committee amended the bill along the lines of a recommendation contained in the U.S. Supreme Court's *"Abood"* decision * ˮ *, which upheld the constitutional validity of state "agency shop" legislation. * * *
>
> Under the terms of the bill, as amended, nonmembers can appeal the amount of any union-determined rebate by bringing their cases (individually or collectively) before a three-member tripartite board with staggered terms which would be appointed by the Governor with the advice and consent of the Senate. [Assembly Labor Committee Statement, *supra.*]

In the face of this clear legislative history, we find no error in PERC's conclusion that the subpoena *duces tecum* was properly quashed because the information it sought to obtain was not relevant to matters within its jurisdiction.

Appellant's next contention is that the BEA's practice of transmitting a portion of her representation fee to labor organizations that are affiliated with her majority representative constitutes an unfair labor practice. Respondents contend that appellant did not charge this issue as an unfair labor practice in her original complaint, nor was this issue raised by the evidence presented before the hearing examiner. We have examined the record and conclude that appellant's challenge to the dues structure before PERC was limited to the allegation that the difference between the fees charged nonunion members of the teaching staff and union members of the support staff was

discriminatory. PERC rejected that challenge and appellant does not seek review of that determination here.

It is a well-settled principle that appellate courts should decline to consider issues not fully presented at trial unless the issues are jurisdictional or concern matters of great public interest. *Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234 (1973). Appellant's failure to produce evidence regarding the majority representative's transmittal of a portion of her representation fee to affiliated labor organizations may have induced respondents to refrain from presenting rebuttal or explanatory evidence. *See Kleinberg v. Schwartz*, 87 *N.J.Super.* 216, 226 (App.Div.1965), aff'd, 46 *N.J.* 2 (1966). We have carefully reviewed the record of the proceedings before the hearing examiner and are satisfied that there is an insufficient factual basis to warrant our consideration of this issue on the record presented.

## IV

We turn now to the constitutional challenge leveled against the statutory provision that authorizes agreements requiring nonunion members to pay a representation fee to their majority representative. We consider this challenge to be directed to the facial validity of the statute in the context of first-amendment guarantees. The record before us does not permit consideration of the precise manner in which the statutory authorization to collect and expend the representation fee was implemented.[1] Moreover, the Court was advised at oral argument that the BEA demand-and-return system introduced into evidence has

---

[1]As discussed above, PERC properly upheld the quashing of appellant's subpoena *duces tecum* for the production of financial records. The records sought related to the calculation of the representation fee and rebate, including a breakdown of the union's expenditures. Because these matters fall within the exclusive jurisdiction of the statutory appeal board, appellant was unable to develop a record before PERC on these issues.

since been terminated and replaced with a new demand-and-return system, which is not part of the record.

Appellant's challenge to the statute focuses on the provision that permits nonmember fees to be applied to certain lobbying expenditures. *N.J.S.A.* 34:13A–5.5(c). Appellant asserts that her rights to freedom of speech and association under both the United States and New Jersey Constitutions have been infringed because use of her representation fee is not limited to activities related to bargaining and contract administration, but could also cover lobbying activities for political and social issues not related to bargaining. Accordingly, appellant does not object to the requirement that she bear part of the cost of the various collective negotiation efforts that benefit members and nonmembers alike. She does object, however, to the use of her representation fee for lobbying activities, because that use may result in her fee being applied to objectives that she may oppose and with which she may desire not to be associated.

Prior to the 1979 amendments to the Act, in *New Jersey Turnpike Employees' Union v. New Jersey Turnpike Auth.*, 64 *N.J.* 579 (1974), aff'g per curiam 123 *N.J.Super.* 461 (App. Div.1973), this Court considered the validity of a provision in an agreement that compelled nonunion public employees to contribute to their majority representative's direct costs of collective negotiations and the processing of grievances. The Court invalidated the provision, reasoning that it deprived the nonunion employees of their statutory right to refrain from union activity without any fear of penalty. *Id.; see N.J.S.A.* 34:13A–5.3. The 1979 amendments to the Act, however, modified the existing law by authorizing agreements that required nonunion members of the majority representative to contribute to the cost of activities connected with collective negotiations. It is the validity of this legislation that we are called upon to review here.

In considering appellant's attack on the constitutionality of the 1979 amendments, we are mindful that the presumption

of validity that usually attaches to a legislative enactment is unavailable when the statute is challenged on first-amendment grounds. *United States v. C.I.O.,* 335 *U.S.* 106, 140, 68 *S.Ct.* 1349, 1366, 92 *L.Ed.* 1849, 1870–71 (1948) (Rutledge, J., concurring); *Thomas v. Collins,* 323 *U.S.* 516, 529–532, 65 *S.Ct.* 315, 322–323, 89 *L.Ed.* 430, 440–41, reh'g denied, 323 *U.S.* 819, 65 *S.Ct.* 557, 89 *L.Ed.* 650 (1945); *New Jersey Chamber of Commerce v. New Jersey Election Law Enforce. Comm'n,* 82 *N.J.* 57, 70 (1980). Our inquiry must be to determine if the statute permits an infringement on first-amendment rights, and to the extent that it does, whether or not such infringement is clearly outweighed by a significant or substantial governmental interest that is advanced by the statute in question. *See NAACP v. Alabama,* 357 *U.S.* 449, 463–65, 78 *S.Ct.* 1163, 1172–73, 2 *L.Ed.* 2d 1488, 1500–01 (1958); *American Communications Ass'n v. Douds,* 339 *U.S.* 382, 399–400, 70 *S.Ct.* 674, 684–685, 94 *L.Ed.* 925, 944 (1950); *Schneider v. Irvington,* 308 *U.S.* 147, 161, 60 *S.Ct.* 146, 150, 84 *L.Ed.* 155, 164–65 (1939); *cf. New Jersey Chamber of Commerce, supra,* 82 *N.J.* at 70 (in first-amendment overbreadth challenge, inquiry is whether there exists a compelling state interest that is substantially served by the statute and that clearly outweighs repressive effect on first-amendment rights).

The Sponsors' Statement to the 1979 amendments to the New Jersey Employer-Employee Relations Act suggests that the governmental interest advanced by the bill is the provision of a fair-share formula for nonunion member payroll deductions so that the cost of union services that benefit both union and nonunion members alike will not burden unfairly the members of the union. This governmental interest must be assessed in the context of the underlying purpose of the New Jersey Employer-Employee Relations Act, namely, to foster the prevention and prompt settlement of labor disputes in the public and private sector. *N.J.S.A.* 34:13A–2. This purpose was implemented by the statutory authorization of public employee unions and the requirement that they negotiate for all employ-

ees in the unit, regardless of union membership status. *N.J. S.A.* 34:13A–5.3. The original statute and its 1979 amendments demonstrate a state interest in promoting stability in public-sector employment by authorizing majority-unit representation of all employees for collective negotiations and grievance procedures, with the cost to be shared equitably among members and nonmembers.

Given this governmental interest, our task is to ascertain if the statute in its probable application can be sustained in the face of the first-amendment rights that it affects. In undertaking this assessment, our clear duty is to construe the statute in a manner that would uphold its constitutionality if it is reasonably susceptible to such a construction. *New Jersey Bd. of Higher Educ. v. Shelton College,* 90 *N.J.* 470, 478–79 (1982); *State v. Profaci,* 56 *N.J.* 346, 349–50 (1970); *Woodhouse v. Woodhouse,* 17 *N.J.* 409, 416 (1955).

The basic issue of the constitutionality of a statute mandating nonmember financial support for union activities was first addressed by the United States Supreme Court in *Railway Employes' Dep't v. Hanson,* 351 *U.S.* 225, 76 *S.Ct.* 714, 100 *L.Ed.* 1112, stay denied, 351 *U.S.* 979, 76 *S.Ct.* 1044, 100 *L.Ed.* 1494, reh'g denied, 353 *U.S.* 859, 77 *S.Ct.* 22, 1 *L.Ed.*2d 69 (1956). In *Hanson,* nonunion employees of the Union Pacific Railroad Company sued their employer and labor organizations representing railroad employees to enjoin enforcement of a union-shop agreement under which, as a condition of continued employment, all employees were required to become members of a specified union within sixty days. This union-shop agreement was entered into pursuant to a 1951 amendment to the Railway Labor Act adopted by Congress for the purpose of insuring that "those who enjoy the fruits and the benefits of the unions should make a fair contribution to the support of the unions." *Id.* 351 U.S. at 231, 76 *S.Ct.* at 717, 100 *L.Ed.* at 1130. The Court recognized the presence of important first-amendment issues:

> Wide-ranged problems are tendered under the First Amendment. It is argued that the union shop agreement forces men into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought protected by the Bill of Rights. It is said that once a man becomes a member of these unions he is subject to vast disciplinary control and that by force of the federal Act unions now can make him conform to their ideology. [*Id.* at 236–37, 76 *S.Ct.* at 720–21, 100 *L.Ed.* at 1132–33 (footnotes omitted).]

Notwithstanding these first-amendment concerns, the *Hanson* Court upheld the union-shop agreement, concluding that "the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate * * * the First * * * Amendment * * *." *Id.* at 238, 76 *S.Ct.* at 721, 100 *L.Ed.* at 1134.

Subsequently, in *International Ass'n of Machinists v. Street,* 367 *U.S.* 740, 81 *S.Ct.* 1784, 6 *L.Ed.*2d 1141 (1961), the Court was confronted with a challenge to the constitutionality of the union-shop provisions of the Railway Labor Act, not with respect to the basic authorization of the union shop but rather regarding dues paid by the plaintiffs pursuant to the union-shop agreement that were being used "to finance the campaigns of candidates for federal and state offices whom [plaintiffs] opposed, and to promote the propagation of political and economic doctrines, concepts and ideologies with which [plaintiffs] disagreed." *Id.* at 744, 81 *S.Ct.* at 1787, 6 *L.Ed.*2d at 1147. The Court in *Street* avoided the constitutional issue by construing the Railway Labor Act to preclude the challenged use of funds:

> We respect [the] congressional purpose when we construe [the statute] as not vesting the unions with unlimited power to spend exacted money. We are not called upon to delineate the precise limits of that power in this case. We have before us only the question whether the power is restricted to the extent of denying the unions the right, over the employee's objection, to use his money to support political causes which he opposes. Its use to support candidates for public office, and advance political programs, is not a use which helps defray the expenses of the negotiation or administration of collective agreements, or the expenses entailed in the adjustment of grievances and disputes. In other words, it is a use which falls clearly outside the reasons advanced by the unions

and accepted by Congress why authority to make union-shop agreements was justified. [*Id.* at 768, 81 *S.Ct.* at 1799, 6 *L.Ed.*2d at 1160–61.] [2]

In *Brotherhood of Ry. Clerks v. Allen*, 373 *U.S.* 113, 83 *S.Ct.* 1158, 10 *L.Ed.*2d 235 (1963), the Court considered the appropriateness of injunctive relief to protect the first-amendment interests of employees who objected to their union's use of dues for political objectives unrelated to collective bargaining. The Court held that it was improper for state courts to enjoin the collection of all membership dues because part of the union's expenditures was devoted to political purposes not authorized by the Railway Labor Act. *Id.* at 119–20, 83 *S.Ct.* at 1162–63, 10 *L.Ed.*2d at 240. Instead, the Court suggested two practical measures by which the union could avoid constitutional conflicts. First, the Court proposed the establishment of a refund system that would return to each dissenting employee the percentage of his mandatory contribution that equaled the ratio that union political expenditures bore to total union expenditures. Second, the Court suggested that future mandatory contributions from such employees be adjusted prospectively by a similar factor. *Id.* at 122–23, 83 *S.Ct.* at 1163–64, 10 *L.Ed.*2d at 242.

*Hanson*'s recognition of the legitimate governmental interest in eliminating the "free ride" problem was first applied to public employee unions in *Abood v. Detroit Bd. of Educ., supra,* 431 *U.S.* 209, 97 *S.Ct.* 1782, 52 *L.Ed.*2d 261. In *Abood,* a Michigan statute required every public employee in a bargaining unit represented by a union to pay as a condition of employment a service fee equal to union dues. The plaintiffs challenged the agency-shop requirement in general and specifically the use of their service fees to support political programs

---

[2]Justice Frankfurter in his dissent expressed the view that Congress intended to make no distinction between expenditures for collective bargaining and expenditures for political purposes, asserting that "[t]he notion that economic and political concerns are separable is pre-Victorian." *Street,* 367 *U.S.* at 814, 81 *S.Ct.* at 1822, 6 *L.Ed.*2d at 1187 (Frankfurter, J., dissenting).

unrelated to their collective bargaining agreements and to which the plaintiffs were opposed.

The *Abood* Court restated the basic first-amendment issue implicated when employees were compelled to pay a service fee to support collective-bargaining expenses of a labor union to which they did not belong:

> To compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests. An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative. His moral or religious views about the desirability of abortion may not square with the union's policy in negotiating a medical benefits plan. One individual might disagree with a union policy of negotiating limits on the right to strike, believing that to be the road to serfdom for the working class, while another might have economic or political objections to unionism itself. An employee might object to the union's wage policy because it violates guidelines designed to limit inflation, or might object to the union's seeking a clause in the collective-bargaining agreement proscribing racial discrimination. The examples could be multiplied. To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. [*Id.* at 222, 97 *S.Ct.* at 1793, 52 *L.Ed.*2d at 276.]

In *Abood,* the employees sought to distinguish the *Hanson* and *Street* decisions on the ground that employees in the public sector were being required to pay dues as a condition of public—not private—employment; that collective bargaining in the public sector is inherently political; that a public employee union, to represent the interests of its employees, engages in political lobbying activities in order to affect the decisions of the governmental representatives, and such lobbying activities necessarily infringe upon first-amendment rights. The issue, said the Court, was "whether a public employee has a weightier First Amendment interest than a private employee in not being compelled to contribute to the costs of exclusive union representation." *Abood,* 431 *U.S.* at 229, 97 *S.Ct.* at 1796, 52 *L.Ed.*2d at 280. Sustaining the Michigan statute, the Court concluded:

> The differences between public- and private-sector collective bargaining simply do not translate into differences in First Amendment rights. Even those commentators most acutely aware of the distinctive nature of public-sector

bargaining and most seriously concerned with its policy implications agree that "[t]he union security issue in the public sector ... is fundamentally the same issue ... as in the private sector.... No special dimension results from the fact that a union represents public rather than private employees." * * * We conclude that the Michigan Court of Appeals was correct in viewing this Court's decisions in Hanson and Street as controlling in the present case insofar as the service charges are applied to collective bargaining, contract administration, and grievance adjustment purposes. [*Id.* at 232, 97 *S.Ct.* at 1798, 52 *L.Ed.*2d at 282.]

With respect to appellant's challenge to expenditures of a political nature, the *Abood* Court extended the statutory analysis in *Street* by holding that dissenting employees cannot constitutionally be compelled to bear the cost of political expenditures unrelated to collective bargaining:

We do not hold that a union cannot constitutionally spend funds for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes not germane to its duties as collective-bargaining representative. Rather, the Constitution requires only that such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will by the threat of loss of governmental employment.

There will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited. * * * We have no occasion in this case, however, to try to define such a dividing line. [*Abood*, 431 *U.S.* at 235–36, 97 *S.Ct.* at 1799–1800, 52 *L.Ed.*2d at 284–85.]

The Supreme Court's decision in *Ellis v. Railway Clerks*, —— *U.S.* ——, 104 *S.Ct.* 1883, 80 *L.Ed.*2d 428 (1984), clarified the distinction between permissible and impermissible union expenses for purposes of mandatory nonunion employee contributions. In *Ellis*, nonunion employees of Western Airlines did not contest the legality of the union-shop agreement, which required them to pay agency fees equal to the dues of union members, but rather objected to the inadequacy of the union's rebate procedure designed to refund that portion of fees attributable to political expenses. They also objected to the application of nonmember fees to six specific union expenses: a quadrennial convention; litigation not involving negotiation of agreements or settlement of grievances; union publications;

social activities; death benefits for employees; and general organizing efforts.

The Court in *Ellis* struck down the rebate system on the ground that it constituted "an involuntary loan for purposes to which the employee objects." *Id.* at ——, 104 *S.Ct.* at 1890, 80 *L.Ed.*2d at 439. The Court reasoned that such a result was impermissible because the union had available to it acceptable alternatives, such as granting nonmembers advance reduction of representation fees, or placing any challenged portion of such fees into interest-bearing escrow accounts. *Id.* at ——, 104 *S.Ct.* at 1890, 50 *L.Ed.*2d at 439. With respect to the first-amendment challenge to the union's use of representation fees to finance the six activities, the Court concluded that nonunion employees should not have been charged for the litigation and organizational expenses of the union when they bore no significant relation to collective-bargaining activities. The Court upheld the assessments for conventions, social activities, and union publications (except for those portions devoted to political articles), noting that they were well within the range of union activities that related to the collective bargaining process. The Court declined to rule on the question of death benefits because the union was no longer the employees' exclusive bargaining agent and the employees were no longer covered by the death benefit system. *Id.* at —— – ——, 104 *S.Ct.* at 1895–96, 80 *L.Ed.*2d at 446–47.

Against this backdrop of federal court decisions, we consider the statute before us. First, we note that the New Jersey act expressly carves out from the realm of permissible expenditures those that are "either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment or applied toward the cost of any other benefits available only to members of the majority representative." *N.J.S.A.* 34:13A–5.5(c). This statutory exclusion correctly applies the principle recognized in *Abood* and *Ellis* that fees exacted from nonunion members of the bargaining unit cannot be used to support political or

ideological expenditures not adequately related to collective bargaining or conditions of employment.

The statute does permit a union to finance from the nonmember representation fees those lobbying activities that are "designed to foster policy goals in collective negotiations and contract administration or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through collective negotiations with the public employer." *N.J.S.A.* 34:13A–5.5(c). Kramer contends that this language is so imprecise that it would permit expenditures for broad categories of lobbying activities to which she is opposed, arguing that the requisite statutory connection between such lobbying and "goals in collective negotiations" or "advantages in * * * conditions of employment" is insufficiently delineated in the legislation to protect adequately her first-amendment rights. *See N.J.S.A.* 34:13A–5.5(c).

The statute's broad recognition of lobbying activities as an essential element of public employee union activity accurately reflects the significant quantum of public employee rights and benefits that are determined outside the collective-negotiation process. Public employees in New Jersey are substantially affected by state and local budgetary decisions and by the various laws and regulations that determine conditions of employment as much as, if not more than, by the negotiations conducted by their majority representative. Indeed, many of the most important benefits of public employment are determined by statute and a public employee union that ignored this reality would not represent properly the members and nonmembers in its bargaining unit. *See Abood, supra,* 431 *U.S.* at 227–32, 97 *S.Ct.* at 1795–98, 52 *L.Ed.*2d at 279–81; C.W. Summers, "Public Sector Bargaining: Problems of Governmental Decisionmaking," 44 *Cin.L.Rev.* 669 (1975). Respondent unions can readily identify a number of state statutes that directly affect conditions of employment for public schoolteachers and that would appear to be likely subjects for lobbying activity.

*See, e.g., N.J.S.A.* 18A:66–1 to –192 (Teachers Pension and Annuity Fund); *N.J.S.A.* 18A:28–1 to –17 (tenure); *N.J.S.A.* 18A:6–30 and –30.1 (compensation for wrongful suspension or discharge); *N.J.S.A.* 18A:27–1 to –13 (hiring, contracts, evaluation of nontenured teachers, continuation and termination of employment, and authorization of school board rules governing employment of teachers); and *N.J.S.A.* 18A:30–1 to –8 (sick leave and work related disabilities).

 There may, however, be occasions on which the leadership of a public-employee union commits organizational funds to lobby for or against causes only remotely related to collective negotiations or conditions of employment. Such lobbying is a permissible and accepted activity of labor organizations, consistent with the historical tradition of labor union involvement in social issues. *See, e.g., Abood, supra,* 431 *U.S.* at 235, 97 *S.Ct.* at 1799, 52 *L.Ed.*2d at 284–85; *Street, supra,* 367 *U.S.* at 800–18, 81 *S.Ct.* at 1815–24, 6 *L.Ed.*2d at 1179–89 (Frankfurter, J., dissenting). The more removed the objectives of such lobbying are from collective negotiations or conditions of employment, the less likely it is that such lobbying activities can be financed by involuntary nonmember fees. As the United States Supreme Court noted in *Ellis* and *Abood,* any requirement that a nonunion member pay a fee to the union impinges upon that individual's first-amendment rights of free speech and association. That impact is constitutionally permitted only when the fee is used for objectives germane to collective negotiations or conditions of employment, because the collection of nonmember fees for these purposes promotes the governmental interest in achieving stability in labor relations. *See Ellis, supra,* —— *U.S.* at ——, 104 *S.Ct.* at 1895–96, 80 *L.Ed.*2d at 446–47; *Abood, supra,* 431 *U.S.* at 222–25, 97 *S.Ct.* at 1793, 52 *L.Ed.*2d at 276–78. When the nonunion member's fee is used to finance lobbying activities that have only a distant and tenuous link with negotiations or conditions of employment, it is unlikely that there will be a governmental interest sufficient to sustain the infringement upon first-amendment rights. Since the state

interest invoked to sustain the Act is defined in terms of promoting stability in public employer-employee relations, the objective of a challenged lobbying activity must be measured against this state interest in order to determine if the relationship is sufficient to compel nonmembers to share in the cost of the activity. *See Ellis, supra,* —— *U.S.* at ——, 104 *S.Ct.* at 1891–92, 80 *L.Ed.*2d at 441–42 (expenditures must be sufficiently related to collective bargaining and be necessarily or reasonably incurred in performing duties of exclusive representative to justify imposition on dissenters); *cf. Abood, supra,* 431 *U.S.* at 255, 259–64, 97 *S.Ct.* at 1809, 1811–14, 52 *L.Ed.*2d at 297, 300–303 (Powell, J., concurring) (For each union expenditure to be charged to nonmembers, the state must prove that such compulsory payment is necessary to serve paramount governmental interests.). In the context of this facial challenge to the Act, we do not now attempt to forecast the various objectives of lobbying activities that will or will not meet this standard.

 Our obligation is to construe the statute in a manner that is not repugnant to first-amendment protections. Accordingly, we hold that the lobbying activities authorized by *N.J.S.A.* 34:13A–5.5 must be germane to policy goals in collective negotiations and contract administration or to advantages in wages, hours, and other conditions of employment in order to invoke the state's interest in achieving stability in public-employee labor relations. *Cf. Robinson v. State of New Jersey,* 741 *F.*2d 598 (3d Cir.1984), rev'g 565 *F.Supp.* 942 (D.N.J.1983), *cert.* denied, —— *U.S.* ——, 105 *S.Ct.* 1228, 84 *L.Ed.*2d 366 (1985).[3] That state interest will require that lobbying activities

---

[3]In *Robinson,* the Third Circuit considered the same constitutional challenges to the subject statute, *L.*1979, *c.* 477, as are asserted here. Reversing the district court's determination that the use of nonmember representation fees for lobbying activities by public-employee unions violated the first amendment, the court observed:

So long as the lobbying activities are pertinent to the duties of the union as a bargaining representative and are not used to advance the political and ideological positions of the union, lobbying has no different constitu-

that are supported by nonmember representation fees be relevant to the occupational interests of the employees in the bargaining unit so as to avoid impermissible infringement on first-amendment rights. As construed, we hold that the statute is not facially invalid since it furthers the state's significant interest in public-employment stability without encroaching impermissibly on the rights of free speech and association that are protected by the first amendment to the United States Constitution and by Article I of the Constitution of the State of New Jersey.

## V

Appellant also challenges the demand-and-return system mandated by the statute, contending that it permits the union to use her representation fee for unauthorized purposes and imposes on her the onerous burden of seeking a refund of that portion of the fee expended for impermissible purposes. Taken literally, the statutory language could be read to allow a public-employee union annually to expend nonmember representation fees for political lobbying activities not permitted by the statute and thereafter to refund the portion of the fee improperly expended upon demand by an objecting nonmember. *N.J. S.A.* 18A–5.5(c) and –5.6. Implementation of the statute in this manner not only would be impractical and unreasonable, but would also ignore the Supreme Court's warnings in *Abood,* a case cited by the Sponsors' Statement accompanying the statute, and the holding in *Ellis.*

In his concurrence in *Abood,* Justice Stevens observed that

---

tional implication from any other form of union activity that may be financed with representation fees. [741 *F.*2d at 609.]

The Third Circuit's two-pronged test of constitutionality—"pertinent to the duties of the union as a bargaining representative and * * * not used to advance the political and ideological positions of the union"—imposes a standard for assessment of lobbying activities that is similar to but not identical with the standard we adopt. The *Robinson* court also sustained, in a split decision, the facial validity of the statutory demand-and-return system. 741 *F.*2d at 611–12.

the Court's opinion does not foreclose the argument that the Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining. Any final decision on the appropriate remedy must await the full development of the facts at trial. [431 *U.S.* at 244, 97 *S.Ct.* at 1804, 52 *L.Ed.*2d at 290.]

In *Ellis*, the Court struck down a rebate system that allowed the union to expend agency-shop fees for political purposes and only later offer pro rata refunds to those employees who demanded it:

By exacting and using full dues, then refunding months later the portion that it was not allowed to exact in the first place, the union effectively charges the employees for activities that are outside the scope of the statutory authorization. The cost to the employee is, of course, much less than if the money was never returned, but this is a difference of degree only. The harm would be reduced were the union to pay interest on the amount refunded, but respondents did not do so. Even then the union obtains an involuntary loan for purposes to which the employee objects.

The only justification for this union borrowing would be administrative convenience. But there are readily available alternatives, such as advance reduction of dues and/or interest-bearing escrow accounts, that place only the slightest additional burden, if any, on the union. Given the existence of acceptable alternatives, the union cannot be allowed to commit dissenters' funds to improper uses even temporarily. A rebate scheme reduces but does not eliminate the statutory violation. [— *U.S.* at —, 104 *S.Ct.* at 1890, 80 *L.Ed.* 2d at 439.]

As noted above, the demand-and-return system in evidence before PERC was repealed before oral argument, and the replacement system is not in the record before us.[4] In view of this deficiency in the record, we consider appellant's challenge to be limited to the facial validity of the statutory provisions requiring the adoption of a demand-and-return system.

■ We note at the outset that the statute imposes a ceiling on nonmember representation fees by limiting them to 85% of regular membership fees, dues, and assessments. *N.J.S.A.* 34:13A–5.5(b). This ceiling clearly reflects the legislative intention to minimize the likelihood that nonmember fees will be

---

[4]Its general terms and conditions, however, were discussed in *Robinson v. State of New Jersey, supra,* 741 F.2d 598, 610–14.

used for purposes proscribed by the statute. This clear legislative purpose cannot be reconciled with the interpretation of the statute urged by appellant, *i.e.*, that subjecting impermissible political lobbying expenses to rebate through the demand-and-return system necessarily reflects a legislative acquiescence in including such expenses in the annual representation fee charged to nonmembers. We reject that interpretation, and hold that the provision requiring unions to refund fees used for impermissible political purposes was intended to describe a specific category of expenditures that could not constitutionally be financed by nonmember fees. It was not designed to authorize the intentional collection of such fees from nonmembers on the theory that the money would later be recoverable through the rebate process.

In our view, the legislative intent requires that the annual representation fee charged to nonmembers be calculated in a manner designed to avoid the use of nonmembers' money for unauthorized purposes. As noted in *Ellis,* no employee may be forced to grant an involuntary loan for purposes to which he objects. *Ellis, supra,* —— *U.S.* at ——, 104 *S.Ct.* at 1890, 80 *L.Ed.*2d at 438–39. A pure rebate system, under which the union would have total discretion as to the use of nonmember funds until the refund is made, cannot adequately protect the dissenting employee. *Id.; Robinson, supra,* 741 *F.*2d at 612. Accordingly, we construe the statutorily mandated demand-and-return system to require that the majority representative compute the annual representation fee charged to nonmembers on the basis of the union's actual expenditures during the prior year. In calculating the fee, the majority representative must take into account the ratio that prohibited expenditures bore to total union expenditures in its previous year's budget. This will require the computation of the current year's representation fee for nonmembers to exclude that percentage of the

union's prior year's budget attributable to expenses that the law prohibits the union to charge to nonmembers.[5]

Adjustment of the nonmember representation fee to reflect the allocation between permissible and impermissible expenditures in the prior year's budget reduces but does not eliminate the possibility that nonmember fees may be put to improper uses. New expenditures or a different allocation of resources in the majority representative's current budget could create the risk that nonmember fees may be improperly expended and then recouped only by refund through the demand-and-return system, a practice condemned by *Ellis, supra,* —— *U.S.* ——, 104 *S.Ct.* 1883, 80 *L.Ed.*2d 428. Refinements of the statutory demand-and-return system can undoubtedly be devised to reduce even further the risk of unconstitutional uses of nonmember fees. *Ellis* suggests the adoption of interest-bearing escrow accounts as a means of preventing the actual use of nonmember funds during the pendency of challenges to proposed expenditures. There are surely other means by which a majority representative can enhance its demand-and-return system to achieve the constitutionally mandated objective. Since the issue here is the facial validity of the statute, we do not anticipate the various circumstances in which challenges to demand-and-return systems could be asserted nor need we decide in advance what refinements may be required to counter such challenges.

The demand-and-return system itself, beyond the statutory requirement that the burden of proof be on the majority representative, must provide an uncomplicated, efficient, and readily accessible process for contesting the representation fee. Such a process must contain no features or conditions that would in any manner inhibit or restrain a nonmember employee

---

[5]Accordingly, the maximum nonmember representation fee for the current year would be an amount equal to membership dues reduced by the percentage of impermissible expenditures in the prior year's budget. In no event may the nonmember fee exceed 85% of the dues charged to members. *N.J.S.A.* 34:13A–5.5(b).

from utilizing it. Obviously, the systems actually adopted by majority representatives will vary in their details, but any challenges to such systems must be measured by the standards imposed by the statute as construed here.

Thus, we hold that the demand-and-return system mandated by *N.J.S.A.* 34:13A–5.6 is not unconstitutional on its face. Supplemented by the procedural safeguards that we have determined are required to achieve the legislative purpose of the Act, the validity of specific demand-and-return systems will depend upon the extent to which they accord this protection to the nonmember employees for whose benefit they must be established.

Accordingly, for the reasons expressed, the judgment of the Public Employment Relations Commission is modified, and, as modified, is affirmed.

*For modification and affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal* —None.