IN MATTER OF THE PETITION OF SOUTH JERSEY GAS COMPANY AGAINST SUNOLIN CHEMICAL COMPANY AND THE B.F. GOODRICH COMPANY.

Superior Court of New Jersey
Appellate Division

Argued June 2, 1988—Decided July 6, 1988.

---

[4]Defendant's argument that some penalties as applied to juveniles have been held unconstitutional while the same penalties applied to adults have been upheld as constitutional is without merit. The cases cited by defendant involved the imposition of life imprisonment without parole eligibility and, thus, are factually distinct from the instant appeal. *See, e.g., Anderson v. Com.,* 465 *S.W.*2d 70 (Ky.Sup.Ct.1971); *Workman v. Com.,* 429 *S.W.*2d 374 (Ky.Sup. Ct.1968); *People v. Marsh,* 36 *Cal.*3d 134, 202 *Cal.Rptr.* 92, 679 *P.*2d 1033 (Sup.Ct.1984).

Before Judges FURMAN, BRODY and SCALERA.

*Michael T. Mishkin* of the Washington, D.C. bar argued the cause for appellants SunOlin Chemical Company and The B.F. Goodrich Company (*McCarter and English*, attorneys, *Richard C. Cooper* and *Steven N.J. Wlodychak* of that firm on the brief, *Squire, Sanders and Dempsey*, of the Washington, D.C. bar, counsel *pro hac vice, Keith R. McCrea* and *Michael T. Mishkin* of that firm, also on the brief).

*Judith B. Appel*, Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utility Commissioners (*W. Cary Edwards*, Attorney General, attorney, *Andrea M. Silkowitz*, Assistant Attorney General, of counsel, *Judith B. Appel*, on the brief).

*Ira G. Megdal* argued the cause for respondent South Jersey Gas Company (Davis, Reberkenny and Abramowitz, attorneys, *Ira G. Megdal, David R. Oberlander* and *Arthur E. Donnelly, III,* on the brief).

*James R. Lacey* argued the cause for intervenor Public Service Electric and Gas Company (*James R. Lacey* and *Shawn P. Leyden,* attorneys).

*Kenneth P. Westreich* argued the cause for intervenor New Jersey Natural Gas Company (*Conway, Reiseman, Mattia and Sharp,* attorneys).

Intervenors Public Service Electric and Gas Company, New Jersey Natural Gas Company and Elizabethtown Gas Company filed a joint brief, *James R. Lacey* and *Shawn P. Leyden, Kenneth P. Westreich* and *Nicholas W. Mattia, Jr., Mary Patricia Keefe* and *Paul J. Chymiy,* on the brief.

The opinion of the court was delivered by

SCALERA, J.A.D.

This case involves a consideration of the right of the New Jersey Board of Public Utility Commissioners (Board) to assume jurisdiction to regulate as a public utility the activities of a supplier of methane-rich fuel in this State.

SunOlin Chemical Company (SunOlin) and B.F. Goodrich (Goodrich) are appealing the decision of the Board holding that SunOlin is a public utility because it is providing such product "for public use." We affirm.

SunOlin is a chemical company that processes refinery "off gasses" into industrial gasses like hydrogen and ethylene. In so doing, it also produces a methane-rich gas that can be burned as fuel in place of natural gas. In 1986 SunOlin entered into a contract to sell this type of fuel to Goodrich. As a result, on February 13, 1987, South Jersey Natural Gas (So. Jersey) filed a petition with the Board seeking to restrain this sale to

Goodrich, to which So. Jersey had previously sold natural gas as a fuel.

The Board transmitted the matter to the Office of Administrative Law for a determination of whether SunOlin was a public utility subject to the jurisdiction of the Board. Intervenor status was accorded to several public utilities as well as others, including the rate counsel from the Public Advocate, the Department of Commerce and Economic Development, New Jersey Industrial Energy Users, the Industrial Customer Group, Public Service Electric and Gas Company (PSE & G), New Jersey Natural Gas Company (N.J. Natural Gas) and Elizabethtown Gas Company (Elizabethtown).

SunOlin stipulated before the Administrative Law Judge (ALJ) both that it "owns, operates, manages or controls pipeline or gas system, plant or equipment in the State of New Jersey" and further that it "operates under privileges granted by this state or a political subdivision thereof" as provided by *N.J.S.A.* 48:2–13. Thus, the only remaining issue became whether its activities amounted to a "public use" as required by that statute for the Board to acquire jurisdiction. On June 10, 1987, the ALJ issued his initial report in which he recommended that the Board treat SunOlin as a public utility within the meaning of *N.J.S.A.* 48:2–13.

The Board followed this recommendation commenting that SunOlin's activities were "clothed in the public interest to such an extent as to require" its regulation and ordered SunOlin to cease and desist from sales of such methane-rich fuel in New Jersey without Board approval. This appeal follows and involves the participation of various parties as noted by their appearances above.

So. Jersey is a regulated public utility engaged in natural gas distribution in all or part of the seven southern counties of the State, serving 180,000 customers, of which 16 are large-volume industrial customers. Its total gas sales revenue for 1986 was

approximately $220 million and its net income for that year was approximately $10 million.

Goodrich's Pedricktown plant, which manufactures polyvinyl chloride resins and acrylic latexes, is located within So. Jersey's franchised territory. The plant has been purchasing gas from So. Jersey for use in its process dryers on a non-interruptible basis under a large-volume tariff and also uses interruptible gas in its boilers.

SunOlin operates its facility in Claymont, Delaware, adjacent to the Sun Refining and Marketing Company's Marcus Hook, Pennsylvania refinery. It processes refinery off-gasses into ethylene, ethylene oxide, hydrogen, carbon monoxide and carbon dioxide. Incident thereto, it also harvests a quantity of salable methane-rich material, the subject of the present controversy. SunOlin also owns a pipeline system consisting of eight lines running across the Delaware river into New Jersey, one of which was a spare six-inch stainless steel line. This pipe now carries the methane-rich fuel to Goodrich and continues south to DuPont's Chambers works in Deepwater. The rest of the pipes are used to carry other products such as nitrogen, hydrogen and petroleum products.

In the beginning of July 1983, Goodrich, seeking to lower its fuel costs, had met unsuccessfully with So. Jersey concerning transportation of gas from the southwest. Goodrich then contacted SunOlin hoping to use the latter's pipelines to transport less expensive natural gas. Instead, SunOlin advised Goodrich that it could sell methane-rich fuel to Goodrich as a cheaper alternative to natural gas fuel. Ongoing negotiations were conducted through late 1983 when SunOlin advised Goodrich that it was no longer interested in selling the fuel. Subsequently, during 1983–1984 several other large user potential customers in New Jersey were contacted by SunOlin but no contracts were consummated, apparently because of the ready availability of less expensive natural gas in the northeast.

In November or December 1985, DuPont was building a "Linde Plant" at its Deepwater facility which would manufacture ethylene which had been purchased from SunOlin and transported to DuPont in the pipeline that ran through Goodrich's plant. SunOlin then also targeted as potential customers for methane-rich fuel, Goodrich and DuPont's Chambers works as well as So. Jersey itself. However, only the negotiations with Goodrich have produced an agreement thus far.

As stated above, the DuPont Chambers plant was conveniently located at the end of the same pipeline being used to supply Goodrich with the methane-rich fuel, sparking SunOlin's interest in selling it to DuPont. Although SunOlin was much more interested in supplying the Chambers and Linde plants, negotiations led to a draft agreement to sell to DuPont's Repauno plant which would require SunOlin to make a substantial capital investment. However, DuPont decided to use its own gas from Texas and Louisiana. SunOlin also actively attempted to sell methane-rich fuel to the other large industrial users in that part of the State but sales contracts were never consummated.

SunOlin's argument on this appeal is essentially that its present activities amount to no more than limited competition by a private company in an area of business in which regulated companies also deal and that its present enterprise does not reach the level of "public use" implicated by the statute and authorizing Board regulation.

The applicable standard of review is dependent upon whether the Board's decision may be categorized as a finding of fact or interpretation of a statute. Findings of fact by administrative agencies are upheld so long as they are supported by substantial credible evidence. *E.g., In re Bridgewater Tp.,* 95 *N.J.* 235, 246 (1984); *Atkinson v. Parsekian,* 37 *N.J.* 143, 149 (1962). If, on the other hand, the Board's determination rests on the interpretation of a statute, a legal issue, the court is not in any way bound by the agency's determination. *Mayflower Securities Co. v. Bureau of Securities,* 64 *N.J.* 85, 93 (1973). The

courts will, however, give substantial weight to the agency's interpretation of a statute which it is charged with enforcing. *Matter of Board of Educ. of Town of Boonton*, 99 *N.J.* 523, 534 (1985), *cert.* den. sub nom. *Kramer v. Public Employment Relations Comm'n*, 475 *U.S.* 1072, 106 *S.Ct.* 1388, 89 *L.Ed.*2d 613 (1986). The facts of this case are not seriously disputed and the Board's findings are based on credible evidence in the record. Thus, we view the issue primarily as one of law. That approach leads us to confront the necessity of defining the parameters of the statutory "public use" standard and to apply it to the facts in this case.

The controlling jurisdictional statute is *N.J.S.A.* 48:2–13 which states in part,

> The term "public utility" shall include every ... corporation ... that now or hereafter may own, operate, manage or control within this State any ... pipeline [or] gas, ... plant or equipment *for public use*, under privileges granted ... by this State or by any political subdivision thereof. [Emphasis added.]

In other words, the statute requires, *"i.e.*, (1) that [a company] owns, operates, manages or controls a [gas or pipeline] system for public use, and (2) that [the company] does this under privileges granted by the State or any of its political subdivisions." *Lewandowski v. Brookwood Musconetcong River, etc., Ass'n.*, 37 *N.J.* 433, 443–444 (1962). SunOlin and Goodrich have stipulated that SunOlin does own, operate or manage a gas or pipeline system and that it does so under privileges granted by the State. Therefore, the only issue remaining under the statute is whether the pipeline or gas system is operated by SunOlin "for public use."

The Board's determination is based on its conclusion that those operations were impressed with a "public interest." In support of this determination the Board relied upon *East Jersey Water Co. v. Bd. Pub. Util. Com.*, 98 *N.J.L.* 449 (E. & A. 1923). There the court held that a water company which diverted water from public streams and distributed it to municipalities for the use of their residents was a public utility even

though it had no obligation under its charter to supply the water diverted by it to the public for general use. The court quoted from *Munn v. Illinois*, 94 *U.S.* 113, 24 *L.Ed.* 77 (1876):

> Property becomes clothed with a public interest when used in a manner to make it of public consequence and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. [98 *N.J.L.* at 452].

Also cited by the Board in support of its conclusion is *Jersey Central P. & L. Co. v. Tri–County R.E. Co., Inc.*, 38 *P.U.R. (NS)* 48 (N.J.Pub.Util.Comm'n 1941) in which the Board found that Tri–County, which furnished electricity, was a public utility despite its claim that it provided service only to its own membership which membership was readily available to any person or organization. The Board rejected Tri–County's argument that its operations were private.

> This Board therefore concludes that the Public Utility Act was designed by the legislature to set up a broad and inclusive scheme of regulation and that the words for "public use" were employed to exclude only operations that were wholly private; operations in which no public interest was involved as where a corporation engaged in business generated electricity for its own use and supplied such energy to its tenants. [*Id.* at 55].

It is apparent then that a determination of "for public use" has always implicated an inquiry into the impact upon the "public interest." However, both *East Jersey* and *Jersey Central* involved factual situations to which a reasonably broad segment of the "public" was actually receiving service from the putative utility indicating that the public interest was gauged in those cases by the extent of the public serviced. SunOlin, on the other hand, is serving only one customer at present, but has indicated its interest in servicing a few other selected customers and unqualifiedly stated that it has no interest in serving a broad "public" because it would be unprofitable to do so. The public interest involved here must be reached through a consideration of the economic impact of SunOlin's "cream skimming" operation upon the regulated rate structure in selling only to the most profitable large customers of public utilities.

Certainly the public interest would be affected if Goodrich produced its own manufactured gas fuel instead of purchasing it from other regulated entities, but that type of activity has been determined to be outside of the statute's scope because such production does not involve any sale. In contrast SunOlin's operation does involve a sale of the fuel to at least one outside entity and it stands ready to offer the fuel to others. *Cf. Junction Water Co. v. Riddle*, 108 *N.J. Eq.* 523 (Chan.1931). SunOlin's previous operations did not arise from the use of a regulated "pipeline" network making it amenable to the regulation requirements of the statute. Now it does and SunOlin has so stipulated. The sale of that pipelined product is also now threatening to detrimentally disrupt the rate structure for fuel products sold by other regulated utilities. In other words, its pipeline operation does affect the public's interest in fuel sales which is otherwise regulated and protected by the Board.

Subjecting SunOlin to Board regulation is not violative of due process if its operation is found to be impressed with a public interest. 64 *Am.Jur.* 2d, *Public Utilities,* § 2 at 552–553; 73B *C.J.S. Public Utilities,* § 3 at 129. "In as much ... as one who devotes his property to a use in which the public has an interest in effect grants to the public an interest in its use, one must submit to be controlled by the public for the common good to the extent of the interest thus created ..." 73B *C.J.S., supra,* § 12 at 150–151.

SunOlin insists that it is exempt from regulation because it is a private company with the public having no right to demand that it sell the methane-rich fuel. A similar claim was rejected in New Jersey in *Jersey Central P. & L. v. Tri–County R.E. Co., Inc., supra,* 38 *P.U.R. (NS)* at 53–54. In addition, unreasonable discrimination by utilities is prohibited by *N.J.S.A.* 48:3–1. If we were to accept this position the result would be to permit SunOlin to escape the confines of the regulatory statute simply by its declaration that it would not sell to certain potential consumers and avoid compliance with the law.

SunOlin argues that an analysis of New Jersey cases reveals that by definition, a public utility requires four elements, at least one of which is present in every case, before it can be concluded that an activity is characterized by such a public interest. Those elements are:

1. The construction of extensive facilities to serve a broad group of consumers;

2. A virtual monopoly over the service provided in a geographic area;

3. A need for utility-type regulation to protect ultimate consumers against rate discrimination *or*

4. A "holding out" of service to the general public.

In cases where a public use has been found to exist heretofore there has been evidence of the "holding out" of service to some portion of the public. See *Lewandowski v. Brookwood, supra,* 37 *N.J.* 433 (1962) (Developer-created water systems serving distinct area is a public utility); *In re Petition of N.J. Natural Gas Co.,* 109 *N.J. Super.* 324 (App.Div.1970), certif. den. 56 *N.J.* 475 (1970) (Oil pipeline system serving development of 1,350 homes is a public utility); *Acquackanonk Water Co. v. Public Util. Bd.* (12 Gummere), 97 *N.J.L.* 366 (Sup.Ct.1922) (Water wholesaler selling to utilities is itself a utility); *Junction Water Co. v. Riddle, supra,* 108 *N.J. Eq.* 523 (Chan.1931) (Private water system serving only 7 homes owned by defendant is not a public utility).

■ However, we agree with the Board that while the presence of such factors do form a basis to permit the assumption of jurisdiction, the absence thereof does not bar a finding of the statutory public use. Public utility status in New Jersey should not depend on whether a company is serving a certain number of customers or indiscriminately "holding out" service to a broad segment of the public. In *Panhandle Eastern Pipeline Co. v. Michigan Pub. Serv. Comm'n,* 328 *Mich.* 650, 44 *N.W.*2d 324 (Sup.Ct.1950), aff'd 341 *U.S.* 329, 71 *S.Ct.* 777, 95 *L.Ed.* 993 (1951) the sale of gas to Ford Motor Co., coupled with the announced intention to sell to other industrial customers, was held to have constituted a sufficient holding out of utility

service to the public subjecting Panhandle to regulation. Likewise the evidence here supports the conclusion that, while SunOlin asserts that no one has a right to demand its services, in reality it stands ready to sell to anyone if it deems it profitable to do so. *See also Re Dome Pipeline Corp.,* 78 *P.U.R. 4th* 1 (Mich.Pub.Serv.Comm'n 1986), rehearing den. 81 *P.U.R. 4th* 549 (1987). There a company proposing to construct a pipeline to deliver ethane as a fuel to one industrial customer while conducting a significant marketing program to sell to others, was deemed to be engaged in providing fuel "to or for the public" and was, therefore, a public utility. Specifically rejected was the argument that the word "public" did not contemplate only a limited number of industrial customers.

SunOlin and Goodrich point to the similar factual situation which was presented in *Coastal States Gas Trans. Co. Inc. v. Alabama Pub. Serv. Comm.,* 524 *So.*2d 357 (Ala.1988), where an interstate pipeline company had contracts to sell directly to two industrial companies and had contacts with others regarding potential sales. The lower court rejected the pipeline's claim that it was not a public utility because it was not offering service to all the public, noting that such non-discriminatory service was required of a public utility and reasoning that the application of a statute cannot be conditioned on a company's willingness to comply with it. The statute in that case, like ours, covered sales "to or for the public." However, the Alabama Supreme Court disagreed, resting its decision to deny regulation on the fact that the pipeline company did not stand ready to service the public, *i.e.,* "all persons who apply without discrimination."

They also point to *Public Util. Comm'n v. Colorado Interstate Gas Co.,* 142 *Colo.* 361, 351 *P.*2d 241, 249–250 (Sup.Ct.1960) in which the court refused to apply the standard indicated in *Panhandle* and its progeny and instead applied the test adopted in *Mobile Gas* requiring an unrestricted offer to the public. *See also Mississippi River Fuel Corp. v. Illinois Commerce Comm'n,* 1 *Ill.*2d 509, 116 *N.E.*2d 394 (Sup.Ct.1953)

(also disapproving of the *Panhandle* approach). However, that approach has been rejected in New Jersey. *Lewandowski v. Brookwood Musconetcong River, etc. Ass'n, supra,* 37 *N.J.* at 446–447; *East Jersey Water Co. v. Board Pub. Util. Comm'rs, supra,* 98 *N.J.L.* at 452.

It is clear that the statutory obligation cast upon the Board requires that it be concerned with the economic impact of cream-skimming transactions such as that practiced here by SunOlin on the regulated activities of public utilities. *Associated Gas Distributors v. FERC,* 824 *F.*2d 981 (D.C.Cir.1987), *cert. den. sub nom. Interstate Natural Gas Ass'n of America, et al. v. Federal Energy Regulatory Comm'n, et al.,* —— *U.S.* ——, 108 *S.Ct.* 1468, 99 *L.Ed.*2d 698 (1988).

One might well inquire if the State is not over-reaching in regulating the activities of companies whose actual sales activities are restricted in scope to less than a substantial segment of the public. We think not. Such a determination has to be based on the *potential* effect of such operations on the regulated milieu without regard to its actual scope if the Board is to discharge its statutory duties. Thus, its decision to regulate SunOlin's pipeline products is fully warranted precisely because those business activities do constitute a substantial potential invasion into the regulation and rate structure of Board regulated companies like So. Jersey and the intervenor companies. On balance such a public interest determination is a logical and reasonable method of determining public use, given the goal of the Legislature in authorizing the Board to regulate such activities. To hold otherwise would be to permit private companies to use equipment described in the enabling statute (such as the pipeline in question here) to potentially wreak havoc with the Board's regulation of such activities, all to the ultimate detriment of the public which the Board was created to serve. *In re Public Serv. Elec. & Gas Co.,* 35 *N.J.* 358, 371 (1961).

Accordingly, we affirm the determination of the Board to assume jurisdiction over the SunOlin operation in question.