TOWNSHIP OF MARLBORO, PLAINTIFF-APPELLANT, v. VILLAGE WATER CO., A NEW JERSEY CORPORATION; PINE BROOK SEWER CO., A NEW JERSEY CORPORATION; CENTRAL JERSEY SEWERAGE CO., A NEW JERSEY CORPORATION; CENTRAL JERSEY WATER CO., A NEW JERSEY CORPORATION; AND U. S. HOME AND DEVELOPMENT CORP., A CORPORATION OF THE STATE OF DELAWARE, DEFENDANTS-RESPONDENTS, AND VILLAGE SEWERAGE CO., A NEW JERSEY CORPORATION; AND BIG BROOK, INC., A NEW JERSEY CORPORATION, DEFENDANTS.

Argued October 13, 1976—Decided December 9, 1976.

*Mr. Roger K. Bentley* argued the cause for appellant (*Mr. J. William Boyle,* attorney).

*Mr. Philip H. Shore* argued the cause for respondent Village Water Co. (*Messrs. Golden, Shore and Paley,* attorneys).

*Mr. Stewart M. Hutt* argued the cause for respondent Central Jersey Sewerage Co., et al. (*Messrs. Hutt, Berkow and Hollander,* attorneys).

*Mr. David L. Bruck* appeared on behalf of respondent Pine Brook Sewer Co. (*Messrs. Greenbaum, Greenbaum, Rowe and Smith,* attorneys).

The opinion of the court was delivered by

SCHREIBER, J. This action involves the validity of two written options which had been assigned to the plaintiff, Township of Marlboro, to purchase the physical assets of the defendants, four water and sewerage companies whose facilities were used to serve parts of the township. The water and sewerage companies, Village Water Co. (VWC), Pine Brook Sewer Co. (Pine Brook), Central Jersey Sewerage Co. (CJS) and Central Jersey Water Co. (CJW), had been created by two residential developers, which required water and sewage facilities for their respective developments. One developer was U. S. Home and Development Corp. (U. S. Home), the parent of CJW and CJS. The other was Big Brook, Inc., owner of Pine Brook[1] and VWC. The water and sewerage companies are "public utilities" as defined in *N. J. S. A.* 48:2–13 and are subject to the general jurisdiction of the Board of Public Utility Commissioners. *N. J. S. A.* 48:2–1 *et seq.*

The Township of Marlboro had created a municipal utilities authority known as the Marlboro Township Municipal Utilities Authority (MTMUA) pursuant to the municipal

---

[1] The Big Brook, Inc. enterprise originally consisted of defendants Village Sewerage Co. and Village Water Co. All the assets of the Village Sewerage Company were subsequently assigned to Pine Brook.

utilities authorities law, *N. J. S. A.* 40:14B–1 *et seq.* Since no sewerage or water facilities could be constructed within the township unless the MTMUA consented, *N. J. S. A.* 40:14B–61, the developers and their respective water and sewerage subsidiaries entered into two separate agreements with MTMUA on December 27, 1963. The option provisions in question were contained in these virtually identical agreements. MTMUA consented to the construction, maintenance and operation of sewerage and water facilities within the developers' respective areas. The agreements also provided that the consents were subject to MTMUA's option to purchase all the water and sewerage facilities and the options were the consideration for the right to operate. The options, exercisable over a ten-year period, contained fixed purchase prices of $745 per house connection for a certain number of houses, the costs of additional houses which were serviced to be adjusted upward by 80% of an Engineering News Record Cost Index over a base date of January 1, 1964. The allocation between water and sewer was $450 and $295 respectively.

Pursuant to *N. J. S. A.* 48:13–11 and *N. J. S. A.* 48:19–17, the utilities sought Marlboro's consents to use the public streets and on December 30, 1963, the Township Committee of the Township of Marlboro adopted resolutions granting its municipal consent permitting construction, maintenance and operation of sewerage and water pipes in the streets, roads and alleys.

Because privileges or franchises granted to a public utility are not valid until approved by the Board of Public Utility Commissioners, *N. J. S. A.* 48:2–14, the defendant water and sewerage companies, CJS, CJW, VWC and Pine Brook filed petitions with the Board seeking, among other things, approval of the various consents which they had received.

On December 20, 1966, the Board approved the franchise granted to CJW, but refused to place its stamp of approval on the purchase option. The decision recited that, except for the option, approval of the municipal consent was in

the public interest. (P.U.C. Dkt. No. 667–485). In another determination rendered on the same day the Board made an identical ruling with respect to CJS. (P.U.C. Dkt. No. 667–486).

In acting on the Pine Brook and VWC petitions on June 23, 1967 and July 20, 1967, the Board again refused to approve the option provisions. In its Pine Brook opinion, the Board included the following findings (substantially the same language appears in its VWC opinion):

> \* \* \* The agreement, dated December 27, 1963, granted a 10-year option to the Authority for the purchase of the sewer system at a fixed price of $295 for each home connected to the system. The record is devoid of any evidence upon which the Board can test the reasonableness of the purchase price.
>
> While *N. J. S. A.* 48:3–7 exempts sales to municipal authorities of utility property from the need for Board approval, we consider a purchase price fixed far in advance of such a sale pursuant to a consent's provisions to be a proper subject of our consideration at this time. Such an agreement may have a direct effect upon the quality of plant to be installed and service rendered the public by the petitioner. During the option period, petitioner is required to supply safe, adequate and proper service. If the price to be paid by the Authority is not a reasonable one, petitioner may be discouraged from making adequate provisions for the design, construction and installation of the system. Financing a system under an option of sale could also present grave problems. Further, the Board has on several occasions rejected this type of option as reducing a utility's incentive to properly maintain and improve its facilities.
>
> There is no affirmative indication that the price in this option is unreasonable, although we note that costs have risen sharply since the price of $295 per house was fixed in 1963. On this record we are unable to make any finding as to the price or as to its possible impact on petitioner's service. In view of our review of the record concerning the municipal consent which follows, we will approve the Authority's consent with the exception of these portions relating to the option.
>
> [*Pine Brook*, P. U. C. Dkt. No. 672–81 (June 23, 1967). *Accord*, VWC, P. U. C. Dkt. No. 674–165 (July 20, 1967)].

On November 25, 1968 and March 19, 1969, the franchise area of VWC was enlarged by resolutions of the Marlboro Township Committee and MTMUA. The service area of Pine Brook was also extended by the Township of

Marlboro in a resolution adopted April 27, 1967. We note in passing that neither of these extensions was made contingent upon the execution of a buy-back arrangement. Nor was a reference made to the option provisions contained in the original MTMUA franchise contracts.

Approximately eight years after the initial consents were given, Marlboro and the adjoining municipality of Manalapan established a joint utility authority, entitled Western Monmouth Utilities Authority (WMUA). WMUA was empowered to "assume in total all the assets, liabilities, bonded indebtedness, and obligations of the Marlboro Township Municipal Utilities Authority. . . ." Those assets did not include the options which, immediately prior to the creation of WMUA, had been assigned by MTMUA to the Township of Marlboro by a resolution dated February 15, 1972. This resolution provided that:

> The Council of the Township of Marlboro will exercise all of said Buy-back Agreements, including the prosecution of all Court and Administrative Agency proceedings required, until either each Buy-back Agreement is enforced or any buy-back agreement is deemed by an Appellate level Court with jurisdiction to be invalid in law or in fact . . . . All benefits of said Buy-back Agreements accrue to the residents of Marlboro Township.

Marlboro notified the various defendants of its intent to exercise the options on April 24, 1972. Finding the defendants unwilling to cooperate, the plaintiff instituted this proceeding in the Chancery Division seeking specific performance of the option agreements and damages.

Three days after this action was filed, WMUA instituted eminent domain proceedings against the plants and facilities of Pine Brook and CJS. As a result of the condemnation proceedings WMUA is now the owner of the Pine Brook and CJS properties.

The Chancery Division granted the defendants' motion for summary judgment on the basis of *Twp. of Deptford v. Woodbury Ter. Sewerage Corp.*, 54 *N. J.* 418 (1969), which had voided an option which had not been approved by the

Board of Public Utility Commissioners. On appeal, the Appellate Division, in an unreported *per curiam* opinion, reversed and remanded the matter for a plenary trial and directed that the trial Court:

* * * consider, among other things, the significance, if any, of: (a) the fact that the Authority's consent was given pursuant to a section of the "municipal utilities authorities law," *N. J. S. A.* 40: 14B–61, while the municipality's consent in *Deptford* was given pursuant to provisions of the Public Utility law governing the incorporation of sewerage companies and water companies, *N. J. S. A.* 48:13–3 and 48:19–3; (b) the question whether the Public Utility Commission has any jurisdiction over the actions and conduct of a municipal utility authority, see *N. J. S. A.* 40:14B–68 and *In re Petition of South Lakewood Water Co.*, 61 *N. J.* 230, 249–250 (1972); (c) the fact that the Authority itself was not actively engaged in the furnishing of sewer and water services at the time the 1963 agreements were entered into; and (d) the fact that this action was instituted not by the Authority but by the Township as its assignee. [*Marlboro v. Village Sewerage*, No. A–2966–72 (App. Div. May 7, 1974)].

At the ensuing trial plaintiff placed into evidence the agreements, consents and P.U.C. decisions. No testimony was produced. At the end of the plaintiff's case, the defendants moved for judgments of dismissal on a number of grounds including the fact that plaintiff had not established underlying factors necessary to ascertain the purchase price. The plaintiff was permitted to reopen and adduced some evidence as to the number of homes in the respective service areas.

In an oral opinion, the trial judge pointed out other deficiencies in the plaintiff's suit, particularly the failure of the plaintiff to compute the sums due the defendants, a factor which he doubted the plaintiff could rectify; failure to tender the monies due; and inability of the defendants to perform since WMUA had taken possession of some of the properties. He bypassed those deficiencies and, finding that the defendant public utilities could not operate unless the local governmental consents were approved by the Board of Public Utility Commissioners, he concluded that in accordance with the rationale of *Twp. of Deptford v. Woodbury Ter. Sewerage Corp.*, 54 *N. J.* 418 (1969), the purchase

options were void and entered judgments for the defendants. On appeal the Appellate Division in an unreported opinion affirmed substantially for the reasons expressed by the trial judge. We granted plaintiff's petition for certification. 69 *N. J.* 83 (1975).

The dispute in this case hinges on the jurisdictional relationship between the Board of Public Utility Commissioners and municipalities or municipal utility authorities over privately-owned water and sewerage public utilities. In large part that relationship has been discussed and settled in *Twp. of Deptford v. Woodbury Ter. Sewerage Corp.*, 54 *N. J.* 418 (1969) and *In re Petition of South Lakewood Water Co.*, 61 *N. J.* 230 (1972).

On numerous occasions we have acknowledged "that the Legislature in Title 48 intended to delegate the widest range of regulatory power over public utilities" to the Board. *Twp. of Deptford v. Woodbury Ter. Sewerage Corp.*, 54 *N. J.* at 424. *In re Public Service Electric and Gas Co.*, 35 *N. J.* 358, 371 (1961); *Atlantic Coast Electric Ry. Co. v. Board*, 92 *N. J. L.* 168 (E. & A. 1918).

Apropos that power, *N. J. S. A.* 48:2–14 provides that:

> No privilege or franchise granted after May first, one thousand nine hundred and eleven, to any public utility by a political subdivision of this state shall be valid until approved by the board. Such approval shall be given when, after hearing, the board determines that the privilege or franchise is necessary and proper for the public convenience and properly conserves the public interests. In granting its approval the board may impose such conditions as to construction, equipment, maintenance, service or operation as the public convenience and interests may reasonably require.

This statute makes it abundantly clear that consents granted by municipalities to public utility water companies, *N. J. S. A.* 48:19–20, or to public utility sewerage companies, *N. J. S. A.* 48:3–11, must be approved by the Board. The municipal authority is the *alter ego* of the municipality, and at least in this respect, it would seem that consents of mu-

nicipal utilities authorities must likewise be approved by the Board. Until approved, the consent or franchise is not valid. *Aldrich Water Co. v. Sprinkle,* 70 *N. J. Super.* 134, 140 (Law Div. 1961) ; *Whitehead v. Bd. Public Utility Commrs.,* 108 *N. J. L.* 258 (E. & A. 1931) ; *Junction Water Co. v. Riddle,* 108 *N. J. Eq.* 523 (Ch. 1931). Though the consenting governmental power may be empowered to condition its grant, those conditions cannot be deemed effective in the absence of Board approval. The Board may, in approving a franchise or privilege, impose conditions which in its expertise the public convenience requires. It follows, then, that the Board has a veto power over conditions imposed by governmental agencies which may inhibit the Board's regulatory control over public utilities. We pointed out in *Deptford* that the Board's approval of a municipal consent to operate, but disapproval of an option to purchase the utiilty's assets, was consonant with the Board's power and duty to assure that the public utility would render safe, adequate and proper service. *N. J. S. A.* 48 :2–23. That power and duty dovetail with the statutory delegation to the Board of the authority to impose conditions in the public interest when granting its approval of a governmental consent. *Gershkowitz v. Board of Public Utility Commissioners,* 123 *N. J. L.* 606, 609 (Sup. Ct. 1940). Therefore, where the purchase option is justifiably disapproved by the Board in connection with approval of the franchise consent, the option is ineffective and invalid.

We note in passing that neither the Marlboro Township Municipal Utilities Authority nor the Township appealed from the Board's determinations exercising the options.[2] It was not until more than eight years after the consenting resolutions were passed and approximately five years after the Board's disapprovals that the Township attempted to

---

[2]The effect of not having appealed from those orders has not been raised and we have not considered any related issues in that connection.

exercise the option, not for the purpose of operating the water and sewage systems,[3] but to reap the difference between the fair market value of the properties and the option prices.

■ The plaintiff's contention that the Board had no authority to void the option because of *N. J. S. A.* 48:3–7, was made and rejected in *Deptford,* 54 *N. J.* at 426–427, and we continue to adhere to that view. *N. J. S. A.* 48:3–7 states that:

> No public utility shall, without the approval of the board, sell, lease, mortgage or otherwise dispose of or encumber its property, franchises, privileges or rights, or any part thereof; or merge or consolidate its property, franchises, privileges or rights, or any part thereof, with that of any other public utility.
>
> *        *        *        *        *        *        *        *
>
> Every sale, mortgage, lease, disposition, encumbrance, merger or consolidation made in violation of this section shall be void.
>
> Nothing herein shall prevent the sale, lease or other disposition by any public utility of any of its property in the ordinary course of business, *nor require the approval of the board to any grant, conveyance or release of any property or interest therein* heretofore made or hereafter to be made by any public utility to the United States, State or any county or municipality or any agency, authority or subdivision thereof, for public use. [Emphasis supplied].

Prior to 1962 the exception concerning transfers to municipalities only applied to lands or interests therein. We construed the exemption provision when the statute was in that posture "to apply to present transfers only, and not to an option which may or may not be exercised at any time in the future." *Deptford,* 54 *N. J.* at 426. We do not believe that the Legislature by broadening the exemption category from land to property intended to modify or alter either the basic policy of the Board's broad regulatory control over public utilities or the principle that exceptions to that control should be narrowly construed.

---

[3]Marlboro had agreed to transfer the water and sewage systems to the WMUA.

Although a sale to a municipality may be exempt, the outstanding option agreement can have, as the Board recognized

\* \* \* a direct effect upon the quality of plant to be installed and service rendered the public by the petitioner. While it operates as a public utility [during] the option period, petitioner [the public utility company] is required to supply safe, adequate and proper service. If the price to be paid by the authority does not reflect the reasonable net investment in the property, this would tend to impose a possible limitation on the petitioner relative to the design, construction and installation of the system. Financing a system under an option of sale could also present grave problems. [*Village Water Company*, P. U. C. Dkt. No. 674–165 (July 20, 1967)].

The Board has consistently adhered to that position. *Marlton Sewerage Corp.*, 60 *P.U.R.* 3d 223 (1965); *Harmony Sewer Co., Inc.*, P.U.C. Dkt. No. 633–172 (August 21, 1963); *Public Sewerage Corp.*, P.U.C. Dkt. No. 648–547 (March 18, 1965); *West Windsor Sewer Co.*, P.U.C. Dkt. No. 709–502 (January 21, 1971). In *Deptford* we recognized that the Board's interpretation as the administrative agency charged with enforcement of Title 48 was entitled to due consideration, *see Harper v. New Jersey Mfrs. Cas. Ins. Co.*, 1 *N. J.* 93, 98 (1948), and we remain committed to that view. The change in the exemption language in *N. J. S. A.* 48:3–7 from "land" to "property," *L.* 1962, *c.* 198, § 36, does not expand the statutory "grant, conveyance or release" to mean more than a present transfer. Further, an option to sell is not a "grant, conveyance or release." It is in the nature of an encumbrance, a transaction which has not been exempted from the Board's jurisdiction. We continue to adhere to the interpretation expressed in *Deptford*.

The plaintiff argues that *Deptford* is distinguishable because here the utilities voluntarily entered into option agreements separate and apart from the consents granted by the Township and the Marlboro Township Municipal Utilities Authority. The rationale of *Deptford* and the supportive public policy do not depend upon the voluntariness of

the parties. Furthermore the grants of the consents depended on the utilities' irrevocable option offers. The options were conditions of the grant. Each agreement expressly reflected that the Authority was "desirous of granting said consent subject to the Applicants [the public utilities] and Developer entering into an option of purchase and has heretofore or simultaneously with the execution of this agreement, granted the aforesaid Consents." The options also stated that "in consideration" of granting the option, the Authority was consenting to the utilities' construction and operation of sewerage and water systems. Furthermore, plaintiff's counsel conceded at trial that "there is no question whatsoever that these defendants had to execute or had to sign a buy-back agreement in order to get municipal consent. . . ." We are satisfied that the consents to operate were conditioned, as in *Deptford,* by the purchase options.

The plaintiff also contends that *In re Petition of South Lakewood Water Co.,* 61 *N. J.* 230 (1972), holds that the Board has "no jurisdiction whatsoever over a municipal utilities authority." This case is inapposite. In *South Lakewood Water Co.,* the authority refused to consent to a private water company's extension of its operations within the authority's territory. The Court held the Board could not override the authority's refusal to grant a consent by authorizing the utility to operate within the proscribed area since the power to grant the franchise has been delegated to the authority. This is not to say that once the consent has been granted, the Board has no jurisdiction with respect to conditions sought to be imposed by the authority which may affect the utilities' ability to render adequate service to the public.

Lastly, the plaintiff relies upon *Lakewood Tp. Mun. Util. v. So. Lakewood Water Co.,* 129 *N. J. Super.* 462 (App. Div. 1974). The option agreement involved there set the purchase price as the value of the property at the time of the transfer, and provided that in the event no mutually satisfactory price could be agreed upon, three disinterested

persons would determine the purchase price. The only issues were whether the municipality's utility authority could rightfully exercise the option which had been executed in favor of the township and whether the three persons who were to set the price were to act as arbitrators or appraisers. The case does not reveal whether the Board of Public Utility Commissioners had approved the option. Presumably it had. But in any event the case does not discuss or consider any of the issues pertinent to this proceeding.

We are satisfied that the options of the Marlboro Township Municipal Utilities Authority were ineffective in the absence of the Board's approvals. The judgment is affirmed.

*For affirmance*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.