IN THE MATTER OF THE PETITION OF SOUTH JERSEY GAS COMPANY AGAINST SUNOLIN CHEMICAL COMPANY AND THE B.F. GOODRICH COMPANY.

Argued March 13, 1989—Decided August 3, 1989.

*Michael T. Mishkin,* a member of the District of Columbia bar, argued the cause for appellants (*McCarter & English,* attorneys; *Richard C. Cooper* and *Steven N.J. Wlodychak,* on the brief).

*Ira G. Megdal* argued the cause for respondent South Jersey Gas Company (*Davis, Reberkenny & Abramowitz,* attorneys; *Ira G. Megdal* and *David R. Oberlander,* on the brief).

*James R. Lacey* argued the cause for respondent Public Service Electric and Gas Company (*James R. Lacey* and *Shawn P. Leyden,* attorneys; *James R. Lacey* and *Shawn P. Leyden,* on the brief).

*Kenneth P. Westreich* argued the cause for respondent New Jersey Natural Gas Company (*Reisman, Mattia and Sharp,* attorneys; *Kenneth P. Weistreich* and *Nicholas W. Mattia, Jr.,* on the joint letter brief).

*Judith B. Appel,* Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel).

*Mary Patricia Keefe* on behalf of respondent Elizabethtown Gas Company submitted a joint letter brief with co-respondents Public Service Electric and Gas Company and New Jersey Natural Gas Company (*Mary Patricia Keefe* and *Paul J. Chymiy,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

In this case we consider whether SunOlin Chemical Company (SunOlin), a corporation that seeks to harvest the by-product of a refinery process and to use its New Jersey pipeline system to sell methane-rich gas to a select group of large industrial users, is a "public utility" subject to the jurisdiction of the Board of Public Utility Commissioners (BPU or Board). The Appellate Division affirmed the Board's determination that SunOlin's activities were "clothed in the public interest to such an extent as to require" that SunOlin be subject to BPU jurisdiction. 226 *N.J.Super.* 327, 330 (1988). We granted certification, 114 *N.J.* 299 (1988), and now affirm.

## I.

The material facts are set forth in detail in the Appellate Division opinion, 226 *N.J.Super.* at 329–32. For our purposes a summary will be sufficient.

SunOlin operates a chemical plant in Claymont, Delaware, where it converts oil refinery by-products produced by SunOlin Company, its parent corporation, into industrial gases. As part

of this process, SunOlin produces a by-product known as methane-rich fuel (MRF). MRF can be used as an alternative-energy source to natural gas, provided that certain firing equipment has been adapted. MRF is generally suitable for industrial but not residential use. SunOlin produces approximately 8,000 to 10,000 million cubic feet (mcf) of salable MRF every day.

SunOlin maintains and operates a T-shaped network of eight pipelines, which originate from Claymont, Delaware. The pipelines are capable of providing MRF to users in Salem and Gloucester counties. The lines traverse both public and private property.

B.F. Goodrich Company (Goodrich) operates a manufacturing facility in Pendrictown, New Jersey. Goodrich uses natural gas to fire boilers and to operate dryers used in a chemical process. Until 1986, Goodrich had been supplied with fuel by South Jersey Natural Gas (South Jersey). South Jersey is a regulated public utility that serves approximately 180,000 residential, commercial, and industrial customers in all or part of seven southern counties of New Jersey. Sixteen of these industrial customers are large volume users, representing approximately twenty percent of South Jersey's firm sales volume.

In July 1983, Goodrich attempted unsuccessfully to enter into an arrangement with South Jersey for the transportation of natural gas from the Southwest. Goodrich subsequently contacted SunOlin, hoping to use SunOlin's pipelines to transport the gas. SunOlin then offered to sell Goodrich MRF as an alternative to natural gas. The transaction was never completed, apparently because SunOlin determined that it would not be profitable.

In the fall of 1985, a pipeline became available through which MRF could be delivered profitably to Goodrich. Goodrich requested that SunOlin develop a proposal to sell and deliver MRF. Goodrich estimated that it could save $18,000 per month by converting to MRF. SunOlin viewed the transaction as an opportunity to develop a broader market for MRF.

While the Goodrich sale was under negotiation, SunOlin pursued other select industrial customers. In particular, E.I. Dupont Nemours and Company (Dupont) was targeted as a potential buyer. In January 1986, SunOlin offered to provide Dupont's Deepwater, New Jersey plant with 3,000 mcf per day of MRF and its Repauno, New Jersey facility with 5,000 mcf per day of MRF. Although a preliminary understanding was negotiated, no contract was ever consummated.

SunOlin offered to sell South Jersey between 8,000 and 10,000 mcf per day of MRF, but South Jersey rejected its proposal. SunOlin also had discussions concerning the sale of MRF with several other large companies in the region including Mobil Oil Research, Monsanto Chemical Company, Shell Oil Company, Allied Chemical, and the Atlantic City Electric Company.

In late 1986, an agreement in principle was reached between Goodrich and SunOlin. SunOlin agreed to provide Goodrich with 617 mcf per day of firm[1] MRF and 1628 mcf per day of interruptible MRF. Goodrich notified South Jersey that it intended to terminate its natural gas service contract as of March 1, 1987. As a result, South Jersey filed a petition with the BPU on February 13, 1987, seeking a preliminary restraining order prohibiting SunOlin from selling and delivering MRF to Goodrich.[2]

---

[1]Gerald Levitt, executive vice-president of South Jersey, testified that "firm" sales connote an absolute commitment by the customer to purchase, and by the supplier to deliver, a minimum quantity of gas each day. "Interruptible" service is a lower-priority service subject to interruption because of limitations or restraints on South Jersey's supply of gas.

[2]Intervenor status was granted to the Division of Rate Counsel, Department of Commerce and Economic Development, New Jersey Industrial Energy Users, the Industrial Customer Group, Public Service Electric and Gas Company (P.S.E. & G.), New Jersey Natural Gas Company, and Elizabethtown Gas Company.

In March 1987, the BPU determined that substantial factual questions existed. It ordered the matter transferred to the Office of Administrative Law for a hearing to consider whether SunOlin was a "public utility" under *N.J.S.A.* 48:2-13 and therefore subject to the jurisdiction of the BPU.

SunOlin stipulated before the Administrative Law Judge (ALJ) that it "owns, operates, manages or controls pipeline or gas system, plant or equipment in the State of New Jersey" and does so "under privileges granted by this state or a political subdivision thereof." 226 *N.J.Super.* at 330. The only question to be determined was whether SunOlin's ownership, operation, management or control of this pipeline or gas system was for "public use." The ALJ reasoned:

> In this jurisdiction, whether an entity is a public utility depends on the character and extent of the use. [*Lewandowski v. Brookwood Musconetcong River, etc., Ass'n.*, 37 *N.J.* 433, 443–45 (1962).] Here, the character of the use is the sale of manufactured gas to only the most profitable industrial customers. The extent of the use is presently one industrial customer, with efforts to obtain other industrial customers held in abeyance. The sale to one customer equates to a revenue loss to South Jersey of $1.3 million and a loss to the State of New Jersey of $210,000 in gross receipts and franchise taxes. The effect on the public could be a rate increase of $400,000. Thus, the sale by SunOlin to one customer is sufficiently substantial to be of consequence to the public. Moreover, if sales of this nature were allowed to proliferate without consideration of the public convenience and necessity, the ability of franchised public utilities to carry out their substantial responsibilities under Title 48 would be jeopardized.

The matter was then returned to the BPU for a final determination on the merits. Defining "public use" as that which effects the "public interest," the BPU ruled that "it is apparent that SunOlin, by making sales to Goodrich, is providing service that is clothed in the public interest to such an extent as to require this Board's regulatory supervision." The rationale for the imposition of jurisdiction was the potential effect that SunOlin's sales of MRF could have on the regulated market for natural gas. The Board also noted that it had the authority to regulate competition by excluding it. *N.J.S.A.* 48:2-14 and 48:9-17.

The Appellate Division affirmed the Board's finding, observing that

> a determination of "for public use" has always implicated an inquiry into the impact upon the "public interest." * * * The public interest involved here must be reached through a consideration of the economic impact of SunOlin's "cream skimming" operation upon the regulated rate structure in selling only to the most profitable large customers of public utilities. [226 *N.J.Super.* at 334.]

The Appellate Division rejected SunOlin's claim that it is exempt from regulation because the public has no right to demand service from it. "If we were to accept this position the result would be to permit SunOlin to escape the confines of the regulatory statute simply by its declaration that it would not sell to certain potential consumers and avoid compliance with the law." 226 *N.J.Super.* at 335.

The Appellate Division ruled that the Board has the authority to exercise jurisdiction over SunOlin:

> [T]he statutory obligation cast upon the Board requires that it be concerned with the economic impact of cream skimming transactions such as that practiced here by SunOlin on the regulated activities of public utilities. * * * Thus, its decision to regulate SunOlin's pipeline products is fully warranted precisely because those business activities do constitute a substantial potential invasion into the regulation and rate structure of Board regulated companies like So. Jersey and the intervenor companies. * * * To hold otherwise would be to permit private companies to use equipment described in the enabling statute (such as the pipeline in question here) to potentially wreak havoc with the Board's regulation of such activities, all to the ultimate detriment of the public which the Board was created to serve. [226 *N.J.Super.* at 338.]

## II.

The sole issue on appeal is whether the BPU was authorized to exercise jurisdiction over SunOlin. The relevant statute, *N.J.S.A.* 48:2–13, states in part:

> The term "public utility" shall include every * * * corporation * * * that now or hereafter may own, operate, manage or control within this State any pipeline [or] gas, * * * plant or equipment for public use, under privileges granted * * * by this State * * *.

Our discussion of this issue is informed by a consideration of the history and scope of public-utility regulation in New Jersey. In addition, we gain perspective by considering the case law in New Jersey and from other jurisdictions concerning regulation

of companies offering public-utility-type services to a limited market. Thirdly, an appreciation of some of the basic economic and market factors pertinent to the proposed transaction enlightens our disposition of the underlying jurisdictional issue.

## A. BPU Regulation

The BPU was created by the Legislature in 1911, *L.*1911, *c.* 195, as a successor to the Railroad Commission. *See Junction Water Co. v. Riddle,* 108 *N.J.Eq.* 523, 528 (Ch.1931). The BPU has "general supervision and regulation of and jurisdiction and control over all public utilities as hereinafter in this section defined * * * so far as may be necessary for the purpose of carrying out the provisions of this Title." *N.J.S.A.* 48:2–13. Regulation and control over public utilities is justified because it is beneficial to the State and its citizens, *Riddle, supra,* 108 *N.J.Eq.* at 528, and is necessary to insure "uniformly safe, proper, and adequate service by utilities throughout the State." *County of Bergen v. Department of Pub. Utils. of N.J.,* 117 *N.J.Super.* 304, 312 (App.Div.1971). The Legislature intended to delegate to the Board "the widest range of regulatory power over public utilities * * *." *Township of Deptford v. Woodbury Terrace Sewerage Corp.;* 54 *N.J.* 418, 424 (1969); *In re Public Serv. Gas & Elec. Corp.,* 35 *N.J.* 358, 371 (1961).

■ The statutory definition of "public utility," *N.J.S.A.* 48:2–13, has remained essentially the same since the BPU's creation in 1911. Once an entity is found to fit within the definition of "public utility," it is subject to the Board's regulatory scheme, which is extensive and detailed. The BPU has the authority to grant franchises and privileges to any public utility, if after a hearing

> the board determines that the privilege or franchise is necessary and proper for the public convenience and properly conserves the public interests. In granting its approval the board may impose such conditions as to construction, equipment, maintenance, service or operation as the public convenience and interests may reasonably require. [*N.J.S.A.* 48:2–14.]

The Board may require public utilities to comply with the laws of this State, to "adopt a uniform system of accounting," and "[t]o furnish periodically a detailed report of finances and operations * * *." *N.J.S.A.* 48:2-16(2)(a), (b). The Board may "[f]ix the fees to be paid by any consumer or user of any product or service of a public utility * * *." *N.J.S.A.* 48:2-20(c). The Board may require every public utility to file schedules listing classifications and rates, tolls, fares, or charges. *N.J.S.A.* 48:2-21(a). The Board may fix rates, *N.J.S.A.* 48:2-21(b), and may determine whether rate increases are just and reasonable. *N.J.S.A.* 48:2-21(d). "The board may enter into compacts in the name of the state of New Jersey with [other] states * * * for the purpose of establishing joint regulation and control of rates for electricity and gas transmitted between such states." *N.J.S.A.* 48:2-22. It is the Board's function to require public utilities to furnish "safe, adequate and proper service * * * and to maintain its property and equipment * * *." *N.J.S.A.* 48:2-23. Public utilities must obtain permission from the Board before discontinuing, curtailing or abandoning any service. *N.J.S.A.* 48:2-24. The Board may require a public utility to "establish, construct, maintain and operate any reasonable extension of its existing facilities * * *." *N.J.S.A.* 48:2-27.[3]

The statutory scheme contemplates that regulated public utilities may be awarded exclusive franchises or privileges:

> Generally speaking, a franchise is a privilege of a public nature conferred by government on an individual or corporation to do that "which does not belong to the citizens of the country generally by common right." In the case of public utilities, it means permission to *operate* a business, peculiarly of a public nature and generally monopolistic. [*In re Petition of South Lakewood Water Co.*, 61 *N.J.* 230, 238 (1972).]

The BPU oversees utilities to prevent abuse of their franchise and to ensure that consumers are provided with safe and

---

3In setting forth the regulatory powers of the BPU, we do not imply that the agency is compelled to assert the full range of its regulatory powers over *any* entity determined to be a public utility.

adequate services at reasonable rates. *See Township of Marlboro v. Village Water Co.*, 72 *N.J.* 99, 108 (1976); *In re Petition of New Jersey Natural Gas Co.*, 109 *N.J.Super.* 324, 335 (App.Div.), certif. denied, 56 *N.J.* 475 (1970).

B.  Decisional Law

Heretofore, the extent of the BPU's regulatory authority over entities dealing in products or services described in the enabling statute, *N.J.S.A.* 48:2–13, has been questioned primarily in factual contexts different from this case. The earlier cases involved claims by *customers* that putative utilities were subject to Board regulation despite the limited market they served. The leading case is *Lewandowski v. Brookwood Musconetcong River Property Owners Association*, 37 *N.J.* 433 (1962), which involved a water system operated by a nonprofit association organized by the developer of a large tract in Sussex County. Purchasers of land from the developer petitioned the Board to assert jurisdiction over the water system. At the time of the hearing before the Board, forty-eight customers were serviced by the Association, 350 to 400 lots had been sold but not improved, and additional lots were for sale. All property owners in the development were to be serviced by the Association's water system. We upheld the Board's assertion of jurisdiction, concluding that whether such a system operates "for public use" depends on "the *character and extent of the use.*" 37 *N.J.* at 445. We concluded that the potential scope of the Association's market, including as it did all present and future homeowners in the development, was sufficient to justify the conclusion that the system was operated "for public use." *Id.* at 447; *see also In re Petition of New Jersey Natural Gas Co.*, *supra*, 109 *N.J.Super.* 324 (Fuel oil distribution system serving ninety-nine percent of residences in retirement community designed for over 1500 homes held sufficient to constitute distribution of oil "for public use"), *certif.* denied, 56 *N.J.* 475 (1970); *East Jersey Water Co. v. Board of Pub. Util. Comm'rs*, 98 *N.J.L.* 449 (E. & A.1923) (Water compa-

ny that sold water at wholesale to other water companies and municipalities operated system "for public use"); *cf. Antique Village Inn v. Pacitti, Robins & Anglin,* 160 *N.J.Super.* 554 (Law Div.1978) (Landlord supplying utilities to shopping center tenants not subject to BPU regulation); *Junction Water Co. v. Riddle, supra,* 108 *N.J.Eq.* 523 (Owner of nine homes that sold water to tenants from his own well not engaged in supplying water "for public use.").

Other state courts, however, have dealt with the "public use" issue in contexts more analogous to the facts of this case, focusing on whether isolated transactions or sales to limited numbers of customers are subject to regulation by their respective state utilities commissions. In one of the earliest cases to consider the question, *Industrial Gas Co. v. Public Utilities Commission of Ohio,* 135 *Ohio St.* 408, 21 *N.E.*2d 166 (1939), an Ohio natural-gas company serving nineteen industrial and twelve private customers appealed from a determination by the Ohio Public Utilities Commission that it was subject to its jurisdiction. The Ohio Supreme Court affirmed, emphasizing that regulation is required even for companies that purposely limit their markets:

> What appellant seeks to do is to pick out certain industrial consumers in select territory and serve them under special contracts to the exclusion of all others except such private or domestic consumers as may suit its convenience and advantage. * * * If a business so carried on may escape public regulation then there would seem to be no valid reason why appellant may not extend the service to double, triple or many times the number now served without being amenable to regulative measures.
>
>       *     *     *     *     *     *     *     *
>
> * * * Each case must stand upon the facts peculiar to it. A corporation that serves such a substantial part of the public as to make its rates, charges and methods of operations a matter of public concern, welfare and interest subjects itself to regulation by the duly constituted governmental authority. [135 *Ohio St.* at 412–414, 21 *N.E.*2d at 168.]

Two other leading cases concerned attempts by Panhandle Eastern Pipe Line Co., an interstate distributor of natural gas regulated by federal law, to supply natural gas to specific large industrial consumers. In *Public Service Commission v. Pan-*

*handle Eastern Pipeline Co.*, 224 *Ind.* 662, 71 *N.E.*2d 117, aff'd, 332 *U.S.* 507, 68 *S.Ct.* 190, 92 *L.Ed.* 128 (1947), Panhandle sought to avoid regulation of its direct sales to Anchor–Hocking Glass Corporation by the Indiana Public Service Commission, contending that the interstate character of its business precluded state regulation and that the limited nature of its direct sales in Indiana was insufficient to subject it to state regulation as a public utility. Panhandle advanced similar contentions in *Panhandle Eastern Pipeline Co. v. Michigan Public Service Commission*, 328 *Mich.* 650, 44 *N.W.*2d 324 (1950), aff'd, 341 *U.S.* 329, 71 *S.Ct.* 777, 95 *L.Ed.* 993 (1951), when it attempted to sell natural gas directly to the Ford Motor Company plant in Dearborn, Michigan. In both cases, the United States Supreme Court affirmed the state courts' holdings that the interstate character of Panhandle's natural gas business did not necessarily pre-empt state regulation of local transactions. *Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n of Indiana, supra*, 332 *U.S.* 507, 68 *S.Ct.* 190, 92 *L.Ed.* 128; *Panhandle Eastern Pipe Line Co. v. Michigan Pub. Serv. Comm'n, supra*, 341 *U.S.* 329, 71 *S.Ct.* 777, 95 *L.Ed.* 993. Both state courts also concluded that Panhandle's direct local sales were subject to state regulation. The Michigan Supreme Court observed:

> Obviously, Panhandle seeks to skim the cream off the market for natural gas in the municipality where the intervening defendant now provides such services, by selling gas to Ford Motor Company and other industrial users, without regard to the public convenience and necessity for natural gas by other users in the Detroit area, particularly for domestic use. If Panhandle is free to compete at will for such local markets, and take the cream of the business, any other utility providing the same service in the same area might be forced to obtain higher rates for its services when it must obtain its natural gas from Panhandle, and thus would face a distinct disadvantage. The right to exclude such competition, where the general public convenience and necessities so require, has been delegated by the legislature to the Michigan public service commission. It is within the power of that commission, after a proper hearing and upon a proper showing of the facts and the necessities, to determine whether Panhandle, by selling natural gas direct to industrial users in Detroit, would thus serve the public convenience and the necessities of users of natural gas in that area where Panhandle now claims the absolute right to engage in such service. [328 *Mich.* at 664, 44 *N.W.*2d at 330.]

*See also P.W. Ventures, Inc. v. Nichols,* 533 *So.*2d 281 (Fla. 1988) (Sale of electricity from cogeneration plant to single major industrial customer constitutes sale "to the public" subject to regulation by Florida Public Service Commission); *Iowa State Commerce Comm'n v. Northern Natural Gas Co.,* 161 *N.W.*2d 111 (Iowa 1968) (Sales by interstate gas company to 1740 "farm tap customers" and 93 industrial/commercial customers subjects company to regulation as public utility); *Cities Serv. Gas Co. v. State Corp. Comm'n,* 222 *Kan.* 598, 567 *P.*2d 1343 (1977) (Direct sales to over 1000 customers by interstate gas company subjects it to state regulation as public utility); *Northern Natural Gas Co. v. Minnesota Pub. Serv. Co.,* 292 *N.W.*2d 759 (Minn.1980) (Direct sales by natural gas company from interstate pipeline to 34 industrial customers and 210 farm customers constitutes sales "to or for the public" subject to regulation by Minnesota Public Service Commission).

Other state courts have been more restrictive, requiring a general holding-out to the public as a prerequisite to regulation as a public utility. *See Coastal States Gas Transmission Co., Inc. v. Alabama Pub. Serv. Comm'n,* 524 *So.*2d 357 (Ala.1988) (Sale of natural gas to several large industrial customers does not constitute sale "to or for the public" subject to regulation by Alabama Public Service Commission); *Public Serv. Comm'n of Colorado v. Colorado Interstate Gas Co.,* 142 *Colo.* 361, 351 *P.*2d 241 (1960) (Direct sales by interstate pipeline company to eleven industrial and public consumers not subject to regulation by Colorado Public Service Commission); *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n,* 1 *Ill.*2d 509, 116 *N.E.*2d 394 (1953) (Direct sales by interstate-pipeline company to twenty-three industrial customers not sales for public use and hence exempt from regulation).

C. Economic and Regulatory Factors

This case also has an economic and regulatory context, only partially developed in this record, which bears on our disposition. We appreciate that the subject of natural gas regulation

is highly technical and complex, and one more appropriately dealt with by expert regulatory agencies than by courts. *See generally* Pierce, *Reconsidering the Roles of Regulation and Competition in the Natural Gas Industry*, 97 *Harv.L.Rev.* 345 (1983) (arguing for less intrusive regulation of natural gas pipelines and markets); R. Pierce, *Natural Gas Regulation Handbook* (1980 & Supp.1982) (providing detailed description of regulation of natural gas industry). Nevertheless, it is all too apparent that the issue before us cannot be viewed separately from the economic and regulatory considerations that undoubtedly influence the views of the parties as well as the Board.

Proofs submitted before the ALJ in this case reflected South Jersey's concern that SunOlin's sale of MRF to Goodrich and potential sales to other industrial customers could significantly and adversely affect South Jersey' sales and profits. The evidence indicated that South Jersey's large volume industrial sales were the most profitable component of its business, yielding rates of return substantially higher than those permitted to be earned from the residential market. Dr. Robert Means, an expert on the subject of natural gas regulation testifying in opposition to the BPU's assertion of jurisdiction, explained that South Jersey's average rate of return over its entire system was between five and ten percent; in comparison, he testified that its rate of return on large volume industrial sales ranged from twenty percent to over fifty percent. Dr. Means testified that over the last six years South Jersey had lost a substantial portion of its large industrial-sales market. He expressed the opinion that South Jersey would continue to lose sales in this market because of its policy of "loading costs" on sales to large industrial customers, compared to the rate policies it applies to residential and other customers.

Both the ALJ and BPU decisions reflect a similar concern about the effect on South Jersey's rate structure of SunOlin's entry into the market. Although the record does not inform us of any BPU policies concerning the relationship between industrial and residential rates for natural gas, we note that in

*Associated Gas Distributors v. F.E.R.C.* 824 *F.*2d 981 (D.C.Cir. 1987), *cert.* denied *sub nom. Interstate Natural Gas Ass'n of America v. F.E.R.C.,* —— *U.S.* ——, 108 *S.Ct.* 1468, 99 *L.Ed.*2d 698 (1988), the majority opinion finds evidence in the record of a policy by local gas distribution companies of "using industrial rates to subsidize residential consumers, perhaps under regulatory pressure from state commissions." 824 *F.*2d at 1035.

SunOlin and Goodrich contend that the Appellate Division's decision is inimical to the objectives of the New Jersey Energy Master Plan (1985) (Energy Master Plan), described as binding on the BPU and other state agencies "to the maximum extent practicable and feasible." *N.J.S.A.* 52:27F–15(b). The Energy Master Plan sets forth as a primary objective "the transition of the State's regulatory framework into a system based primarily on the dictates of free market forces and competitive pressures," *id.* at ii, and directs the BPU to "take all possible steps to promote competition in the natural gas industry * * *." *Id.* at 23.

The Energy Master Plan also advocates, *id.* at 22, acceptance by interstate pipeline companies of the expedited certification procedures set forth in Order No. 436 of the Federal Energy Regulatory Commission (FERC), the validity of which was upheld in *Associated Gas Distributors v. F.E.R.C., supra,* 824 *F.*2d at 1030–38. As the District of Columbia Circuit majority opinion explains, the expedited certification procedures in Order No. 436 were designed to

> stimulate competition and to enhance consumers' access to the wellhead market by making an optional expedited certificate ("OEC") procedure available to pipelines seeking to provide "new service" (*i.e.,* transportation or sales service of a different magnitude or kind than it currently provides, 18 C.F.R. § 157.–101(b)(2)[ ) ] or to acquire or construct facilities to do the same. [*Id.* at 1030.]

The procedures were challenged by state regulatory commissions and local gas distribution companies prompted by

> fear that pipelines will be able to take advantage of the OEC procedures to obtain all of the facilities and certificates necessary to deliver gas directly to end users, bypassing the LDCs [local gas distribution companies] currently

making such sales. Such bypass, if it occurs, would at least in the short run reduce the bypassed LDC's volume and thus force either its shareholders or remaining customers to shoulder higher costs (the so-called "cost-shifting" problem). [*Id.* at 1031.]

The District of Columbia Circuit majority rejected the concern expressed by the dissenting opinion that the new rule has "overridden the states' ability" to subsidize residential consumers by charging higher rates to industrial customers, *id.* at 1045 (Mikva, J., concurring in part and dissenting in part), concluding that state regulatory commissions had sufficient residual powers "by which to control the risk of bypass." *Id.* at 1035.

Thus, it is evident that both New Jersey, through the Energy Master Plan, and FERC, through the expedited certification procedures of Order No. 436, have endorsed a policy of enhanced competition in the marketing of natural gas to industrial consumers. Reconciliation of those policies with the State's strong interest in providing the "lowest reasonable rates" for natural gas, Energy Master Plan, *supra* at 265, is principally the responsibility of the BPU.

## III.

SunOlin and Goodrich challenge the decision below primarily on the ground that jurisdiction over SunOlin was based on its "taking of patronage" from a regulated gas utility, and not on the "character and extent" of the use of its facilities. In our view, it is abundantly clear that the impact of SunOlin's product and sales efforts on the regulated market is an important factor in determining whether the "character and extent" of its business activities warrant BPU regulation.

Although our early cases primarily concerned the efforts of *consumers* to compel BPU regulation of their supplier, *supra* at 260–61, the BPU's regulatory responsibility extends considerably beyond the supplier-purchaser conflict characterized by our decision in *Lewandowski, supra,* 37 *N.J.* 433. As noted, the Legislature intended the BPU to have wide-ranging power over public utilities. *Township of Deptford v. Woodbury Ter-*

race Sewerage Corp., supra, 54 N.J. at 424; In re Public Serv. Gas & Elec. Corp., supra, 35 N.J. at 371. That power clearly imposes on the Board the duty to oversee and regulate competition among public utilities. N.J.S.A. 48:2–14; see In re Greenville Bus Co., 17 N.J. 131 (1954). Accordingly, in determining whether the character and extent of SunOlin's business activities is sufficient to justify an assertion of its regulatory power, the BPU correctly considered the potential impact of SunOlin's business on the regulated market.

We find ample evidence in this record that the character and extent of SunOlin's business is sufficient to support the Board's conclusion that SunOlin was providing service "for public use." The evidence indicated that SunOlin has an available supply of MRF (10,000 mcf per day) that is equivalent to two-thirds of South Jersey's firm industrial volume. Under SunOlin's contract with Goodrich, it provides 617 mcf per day of "firm" MRF per day and 1628 mcf per day of "interruptible" MRF, amounting to approximately twenty percent of SunOlin's available product. The ALJ found that SunOlin's pipelines could be interconnected to deliver MRF to portions of South Jersey's service area in Salem and Gloucester counties, and that SunOlin's sales efforts posed a substantial threat to South Jersey's industrial market. SunOlin had offered to sell MRF to two other industrial customers of South Jersey (the two duPont plants at Deepwater and Repauno), and to South Jersey itself. SunOlin also solicited business from other large industrial users in the region, including Mobil, Monsanto, Shell, Allied Chemical, and Atlantic City Electric Company. Although Goodrich was SunOlin's only MRF customer at the time of these proceedings, the Board was obliged to consider SunOlin's sales potential and marketing efforts in assessing the "character and extent" of its business.

Our determination that the record supports the BPU's holding is reinforced both by the provisional nature of its order and by the regulatory context in which SunOlin's application for a franchise, N.J.S.A. 48:2–14, would be evaluated. The Board

required SunOlin to discontinue MRF sales to Goodrich until such time as it had obtained the required statutory authorizations, *N.J.S.A.* 48:2–14 and 48:9–17. It is in the franchise-application proceeding that the Board is required to consider and evaluate the competitive effect of SunOlin's business activities. *In re Greenville Bus Co., supra*, 17 *N.J.* 131. In the process of that evaluation the Board will be required to take into account a variety of economic and regulatory factors that may not easily be reconcilable. The Board must balance the Energy Master Plan's encouragement of price competition in the industrial market for natural gas against the potential effect such competition could generate in other markets. As the District of Columbia Court of Appeals concluded in sustaining FERC's expeditied certification procedures, *Associated Gas Distribs. v. F.E.R.C., supra*, 824 *F.*2d at 1030–38, on the basis that "state agencies have a variety of powers by which to control the risk of bypass," *id.* at 1035, we also conclude that the BPU possesses the requisite authority and expertise to evaluate SunOlin's market impact in a manner that best harmonizes the prevailing market conditions and regulatory philosophies. It is not only appropriate but essential that that balancing function be performed by the agency charged by the legislature with the supervening responsibility for regulating competition in this market.

In sustaining the Board's assumption of jurisdiction, we find ample support in this record for the Board's findings of fact, *In re Bridgewater Township*, 95 *N.J.* 235, 246 (1984), and accord substantial significance to the BPU's interpretation of the statute it administers. *In re Board of Educ. of Town of Boonton*, 99 *N.J.* 523, 534 (1985), *cert.* denied *sub nom. Kramer v. Public Employment Relations Comm'n*, 475 *U.S.* 1072, 106 *S.Ct.* 1388, 89 *L.Ed.*2d 613 (1986). Our holding should not be read as conferring on the Board regulatory jurisdiction over isolated transactions that threaten no significant impact on a regulated market. Each case in this area turns on its own facts. We are fully satisfied that SunOlin's contract with Goodrich, combined

with its extensive efforts to market its substantial supply of MRF, were sufficient to constitute SunOlin a public utility subject to the BPU's regulatory jurisdiction.

We affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice WILENTZ and Justices STEIN, CLIFFORD, HANDLER, and O'HERN—5

*For reversal*—None.